[No. 7394-0-I.   Division One.   December 29, 1980.]

COPE CONSTRUCTION COMPANY, MANSON GENERAL CON-
STRUCTION & ENGINEERING, GENERAL CONSTRUC-
TION COMPANY, *Appellant,* v. AMERICAN
HOME ASSURANCE COMPANY,
*Respondent.*

*Carney, Stephenson, Siqueland, Badley, Smith & Mueller, Milton C. Smith,* and *Edward Mueller,* for appellant.

*Perkins, Coie, Stone, Olsen & Williams* and *Theodore Collins,* for respondent.

DURHAM, J.—Appellant and cross respondent, Cope–Manson–General (CMG) appeals from a jury verdict which found that it had insurance coverage under a builder's risk policy issued by the respondent and cross appellant, American Home Assurance Company (American Home), and which awarded the appellant damages of $1,545,832. The trial court later reduced the verdict to $641,664. Both parties appeal.

We begin with an outline of the complex chain of events culminating in this lawsuit. In 1969, CMG was awarded a

contract by Cargill, Inc., and the Port of Seattle, for the design and construction of grain storage silos at Pier 86 of the Port of Seattle. CMG let subcontracts to several firms for portions of the work and obtained a builder's risk insurance policy issued by American Home. The policy stated that the named insureds were CMG, Cargill, the Port of Seattle, and the subcontractors "as their interests may appear." It insured against "all risks of direct physical loss or damage" with certain enumerated exceptions, one of which was for "loss or damage caused by or resulting from improper materials, faulty workmanship, or errors in design . . ."

Construction of the silo walls took place from August through November 1969. In order to construct cement walls of the 68 silos, CMG employed the "slip form" method of construction, a sophisticated technique with which CMG had little familiarity. Large cracks and holes in the silo walls began to develop almost immediately after the construction had commenced. Cargill consistently maintained that the condition of the walls made the silos unacceptable. During 1970 and 1971, both CMG and an independent contractor hired by Cargill attempted unsuccessfully to repair the cracks.

Magnetometer tests conducted in 1971 suggested that a significant amount of structural steel had been omitted from the silo walls. Cargill and CMG initially felt this was extremely unlikely. However, in 1972 "slot cuts" were made which convinced all concerned that perhaps as much as a quarter of the required structural steel was missing. During this period, Cargill refused to pay the retainage on the contract to CMG. As a result, neither CMG nor its subcontractors received payments for the work done.

During 1971 and 1972, a number of subcontractors sued CMG for payments. CMG in turn sued its subcontractors for their respective failure to supply adequate concrete, machinery, and reinforcing steel. Ultimately CMG received $904,168 in settlement of these suits. In 1972, CMG sued

Cargill for payments due under the contract, Cargill counterclaimed for damages to the silos, and for the damages resulting from the delay in completion of the project.

Both CMG and Cargill employed experts to determine the extent of repairs that would be necessary. There was considerable disagreement on this point. CMG's expert submitted a recommendation of the work needed to repair the problem in January 1974, without estimating the cost. Shortly thereafter CMG received a second report from another expert, retained to determine the cost of implementing repairs, who estimated the cost at between $250,000 and $1.5 million. Cargill's expert submitted his recommendation in January of 1974, without estimating the cost of repairs. CMG's attorney estimated in March of 1974, that its liability for the damage could range between $1 million and $3 million.

Cargill subsequently decided to follow the recommendations of its own expert, and in September 1974, it contracted with others to have the silos repaired at a cost of more than $2 million. Because this figure greatly exceeded the amount that CMG expected to recover on its claims against Cargill and its subcontractors, CMG notified American Home in December 1974, of its intent to claim damages under its policy. In January 1975, CMG agreed in principle to settle its suit with Cargill, paying Cargill $2.45 million.

CMG filed suit against American Home on April 30, 1975, alleging that the cost of repairs to the silos was covered by its builder's risk policy. American Home denied liability and asserted a number of defenses, including the charge that CMG had failed to commence suit within 12 months of discovering the damage to the silo walls.

After denial of American Home's motion for summary judgment, a lengthy trial ensued. At its conclusion, the trial court denied American Home's motion for a directed verdict and submitted the case to the jury, which awarded CMG $1,545,832, subsequently reduced by the amount recovered by CMG from its subcontractors. The court

denied American Home's motions for new trial and judgment notwithstanding the verdict, and CMG's motion for reconsideration of the reduction of the jury award.

A threshold question in this case concerns the following provision of the insurance contract:

> No suit, action or proceeding for the recovery of any claim under this policy shall be sustainable in any court of law or equity unless the same be commenced within twelve (12) months next after discovery by the Insured of the occurrence which gives rise to the claim, . . .

American Home argues that the "occurrence which gives rise to the claim" in this case was the direct physical damage to the insured property, *i.e.,* the cracks and gaps in the cement walls of the grain silos. Thus, American Home contends, the time period for filing this lawsuit began to run when CMG discovered those cracks. If this definition of occurrence is adopted, then obviously the suit would be barred, for the cracks were discovered in 1969, and the suit was not filed until 1975.

CMG, on the other hand, argues that when the time limitation provision is construed along with the other provisions of the policy, it becomes apparent that the "occurrence" giving rise to the claim was not the physical damage to the silo walls. Rather, CMG contends that the occurrence was its agreement, in January 1975, to reimburse Cargill for the cost of repairing the walls. Only at that time, according to CMG, did it become clear that it would suffer a net loss, because the cost of the repairs exceeded what it expected to recover on its claims against Cargill and the subcontractors.

The trial court submitted the time limitation clause, along with the entire policy, to the jury which found by special interrogatories that CMG had, in fact, commenced suit within the prescribed time. As will be made clear later, we believe that the trial court erred giving this question to the jury. However, to begin we must first attempt to give meaning to this critical clause.

■ In *J.N. Futia Co. v. National Sur. Corp.*, 30 App. Div. 2d 989, 294 N.Y.S.2d 74 (1968), an electrical contractor's policy had time limitation requirements identical to the clause at issue in this case. The contractor had undertaken to install electrical service connections in a preexisting conduit system for the State of New York. In April 1965, after installment, it was found that the connections did not meet the specifications. In July, the contractor uncovered the conduit to replace the defective cable, and discovered, according to its contention, that the damage had been caused by defects in the conduit rather than by its negligent installation of the cable. The State maintained precisely the opposite position, and made only partial payment while the work continued. The State accepted the work on January 7, 1966, and at that time declined to make full payment for the cost of replacing the defective cable. The contractor brought suit to collect the balance under its builder's risk policy, on January 3, 1967. The appellate court affirmed the dismissal of the action, in the following words:

> It seems too clear to require extended discussion that the insurance contract in suit is one of indemnity and that the "peril" insured against, being the "*physical* loss of or *damage* to the *property* * * * from any *external cause*" (emphasis supplied) was just that; it became a debt immediately due from the insurer directly and was not a contingent liability for the monetary damage recoverable, or not, in a suit against a third party allegedly causing the physical loss or damage. It seems equally clear that, within the meaning of the subsequent paragraph 20, embodying the contractual limitation, *the "occurrence which gives rise to the claim" is the event or fact of infliction of physical damage to the property and not the ascertainment of the quantum of monetary damage sustained by the owner.*

(Some italics ours.) *J.N. Futia Co.*, 30 App. Div. 2d at 990, 294 N.Y.S.2d at 76. We find this language convincing.

CMG, however, argues that this interpretation is inconsistent with the clause that defines the perils insured

against as "all risks of direct physical loss or damage except as hereinafter excluded, . . ." The exclusion clauses also refer repeatedly to the "loss or damage" stemming from various causes. According to CMG, had American Home intended the occurrence of physical loss or damage to trigger the running of the limitation clause, it would have used those words in that clause as well.

The use of words "loss or damage" in other clauses does not render the meaning of "occurrence" ambiguous. In *Margulies v. Quaker City Fire & Marine Ins. Co.*, 276 App. Div. 695, 97 N.Y.S.2d 100 (1950), the court used remarkably similar words to express its interpretation of a policy provision requiring suit to be brought within 12 months of the "inception of the loss."

> It is clear from the history of the limitation provisions in standard fire insurance policies that the use of the words "inception of the loss" was intended to refer to the *occurrence of the event giving rise to the claim of liability and not to the accrual of liability.*

(Italics ours.) *Id.*, 276 App. Div. at 699, 97 N.Y.S.2d at 104. We agree with the New York court that, within the context of property insurance, the phrase "occurrence that gives rise to the claim" is simply an alternative way of referring to the occurrence of physical damage.

CMG next points out that under the policy, the named insureds are CMG, Cargill, and the subcontractors, "as their interest may appear" and that the property insured is defined as "all work, labor, materials and supplies (whether property of the Insured or property of others for which the Insured may be responsible or shall have assumed responsibility) . . ." Because CMG is not the owner of the silos, it contends that its interest in them did not arise until it "assumed responsibility" for them by agreeing to pay for the cost of their repair. Only at that point did it become clear to CMG that it would suffer a "loss" because its liability to Cargill for the repairs would exceed what it reasonably expected to recover on its claims against Cargill and the subcontractors.

██ The accepted rule is that any legal or equitable interest or expectancy is sufficient to create an insurable interest. *See* 4 J. Appleman, *Insurance Law and Practice* § 2123 (1969). Under this test, a contractor has been held to have an insurable interest under a builder's risk insurance policy in property under construction.

> [I]f the fire destroyed work that [the contractor] had done and by virtue of it [the contractor], on account of contract, could not recover the value of the work or was required to do it over again, that would be an interest in the physical property.

*Paul Tishman Co. v. Carney & Del Guidice, Inc.*, 36 App. Div. 2d 273, 274, 320 N.Y.S.2d 396, 397 (1971).

This view is consistent with RCW 48.18.040(2):

> "Insurable interest" as used in this section means any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage.

CMG's interest in the construction of the silo walls arose out of its contract with Cargill, and in no way depended upon acceptance by CMG of responsibility for its repair. The reference in the policy to property for which the insured "shall have assumed responsibility" simply extends coverage to property used in construction by CMG or the subcontractors, but which was not owned by them.

CMG argues that our interpretation of the suit limitation clause renders it repugnant to the main objective of the insurance policy, and urges us to adopt the approach taken in *Shamrock Homebuilders, Inc. v. Cherokee Ins. Co.*, 225 Tenn. 236, 466 S.W.2d 204 (1971), relied upon by the trial court here. In that case, Shamrock took out a builder's risk policy on homes it constructed, the coverage ceasing when the house was accepted by the purchaser. The policy contained a time limitation clause identical to the one in this suit. When one of the purchasers discovered, upon moving into a new house, that it had suffered heavy water damage, he demanded that Shamrock rescind the transaction. When a suit followed, Shamrock defended on the grounds that the

damage had occurred after the sale of the house. The purchaser prevailed, however, and Shamrock then filed a claim with its insurer, Cherokee, which denied liability.

Shamrock sued Cherokee, which defended on the ground that the suit was not within 12 months of discovery of damage to the house. The court noted that Shamrock's defense of the prior suit, though unsuccessful, was in Cherokee's best interest, because, had Shamrock prevailed, it would have avoided any loss from damage covered by the policy. The court also acknowledged that Shamrock could not consistently sue Cherokee on the theory that it was the owner of the house at the time it was damaged, while simultaneously defending against the purchaser on the grounds that it was not. It concluded that because strict enforcement of the time limitation clause would be repugnant to the primary purpose of the contract, the time limitation clause would not be enforced while Shamrock was defending against the purchaser's suit.

CMG argues that it likewise would have been prejudiced had it brought suit against American Home while it was involved in litigation with its subcontractors. In those actions, CMG alleged that the damage to the silo walls was caused by faulty workmanship and improper equipment and materials furnished by the subcontractors. It argues that its position would have been compromised had it simultaneously brought suit against American Home, alleging that it, rather than the subcontractors, was the party "responsible" for the damage to the walls.

We do not believe, however, that any prejudice would have resulted. At the same time it was suing its subcontractors, CMG was also engaged in litigation with Cargill, in which Cargill alleged, and CMG denied, that the damage to the silo walls was caused by faulty workmanship and improper materials. Having taken inconsistent positions in those suits, we do not think CMG can argue it would be prejudiced in one additional suit. There was certainly no legal impediment to CMG's taking inconsistent

positions in the two cases. Moreover, at trial CMG successfully prevented American Home from presenting evidence to the jury of CMG's contentions in its suits with its subcontractors. It cannot now reverse its position and urge this court to take them into consideration.

CMG next contends that it could not file the sworn proof of loss required by the policy, alleging that the cause of the damage was one covered by the policy, while maintaining in litigation with the subcontractors that the damage was caused by their negligence—an excluded cause. In support of this proposition, CMG cites *Zurn Eng'rs v. Eagle Star Ins. Co.,* 61 Cal. App. 3d 493, 132 Cal. Rptr. 206 (1976).

Zurn contracted to build a waste water treatment plant for the City of Palo Alto. Its policy incorporated the California statute limiting the time within which suits could be brought under the policy to "12 months next after inception of the loss." *Zurn Engineers,* 61 Cal. App. 3d at 496, 132 Cal. Rptr. at 208. When a pipeline in the plant was damaged, Zurn maintained that the cause was a defect in design—a cause for which it was not responsible, and which was excluded under the policy. The parties attempted to resolve the question of cause for more than a year, until Palo Alto took the position that the pipe was damaged by Zurn's failure to backfill properly, and sought to hold Zurn responsible for the cost of repairs. The insurance company denied liability, and when Zurn brought suit, defended on the ground that the suit had not been filed within 12 months of the loss.

The court noted that, in order to bring a suit, Zurn was first required to file a proof of loss, stating under oath the cause of loss, and that Zurn could not consistently do so while asserting to Palo Alto that the damage was of a kind not covered by the policy. As in *Shamrock Homebuilders, Inc. v. Cherokee Ins. Co., supra,* the court emphasized that that position was advantageous to the insurer, because if Zurn prevailed, the entire loss would have been borne by a third party.

■ We disagree. If there is a legitimate dispute concerning the cause of property damage, the insured may simply state in the proof of loss that the cause of damage is unknown. This would constitute substantial compliance, which is all that is required. 14 R. Anderson, *Couch on Insurance* § 49:498, at 76–77 (2d ed. 1965). As long as it has acted in good faith, the insured may explain, supplement or qualify its original proof of loss at any time, up to and including the commencement of the trial on its claim. *Wallin v. Massachusetts Bonding & Ins. Co.*, 152 Wash. 272, 277 P. 999 (1929). Thus, if there were a legitimate dispute as to the cause of the damage to the silo walls, CMG could simply have stated as much in its proof of loss. We fail to see how this would prejudice CMG in its litigation with the subcontractors over precisely that issue.

CMG also argues that it was advantageous to American Home to permit CMG to delay filing while it pursued its indemnity claims against the subcontractors, because any money it received from them would decrease the amount of CMG's recovery from American Home. This argument flies in the face of common sense.

American Home obviously had a vital interest in the selection of the repair process because it might ultimately have to bear the cost. Yet the insurer was denied a chance to participate in, and perhaps influence, the negotiations over the choice and cost of repair method.

■ Finally, CMG urges us to apply the rule set forth in *Ohler v. Tacoma Gen. Hosp.*, 92 Wn.2d 507, 598 P.2d 1358 (1979), in which the court construed a statute that limited the time for bringing a medical malpractice claim against a physician to within "one year of the time the patient . . . discovered . . . that the injury or condition was caused by said act . . ." RCW 4.16.350(3). The court held that the time did not begin to run until the plaintiff had discovered "all of the essential elements of her possible cause of action, *i.e.*, duty, breach, causation, damages." *Ohler*, at 511.

CMG would have us find a similar requirement in RCW 48.18.200,[1] which governs the validity of suit limitation clauses in insurance policies. However, RCW 48.18.200 does not make discovery relevant to determining the validity of such provisions. The statute is concerned with the date of the *loss,* rather than the date of its *discovery.* The expanded "discovery rule" set forth in *Ohler* is simply inapplicable to RCW 48.18.200. Similarly, the discovery required by American Home's policy is of "the occurrence which gives rise to the claim" under the policy—not discovery of the *cause* of that occurrence.

As noted at the beginning of this opinion, we believe that the trial court erred in asking the jury to decide if CMG had filed its claim within the limits of the policy, or, in the alternative, in denying American Home's motion for a directed verdict. In determining this we must interpret the evidence most strongly against American Home and most favorably for CMG, drawing every reasonable inference in favor of the latter. *Roberts v. Atlantic Richfield Co.,* 88 Wn.2d 887, 568 P.2d 764 (1977); *Haugen v. Minnesota Mining & Mfg. Co.,* 15 Wn. App. 379, 550 P.2d 71 (1976).

We concede that, generally, it would indeed be a jury question as to which facts constituted the "occurrence" so as to trigger the time limitation provisions of the contract. Here, however, we are convinced that reasonable minds could not differ, even when the test set forth above is applied. We acknowledge that the determination in this case that a specific event constituted the "occurrence giving rise to the claim" is a difficult task. No doubt the passage of

---

[1]RCW 48.18.200 reads, in part, as follows:

"(1) No insurance contract . . . shall contain any condition, stipulation, or agreement

". . . .

"(c) limiting right of action against the insurer to a period of less than one year from the time when the cause of action accrues in connection with all insurances other than property and marine and transportation insurances. In contracts of property insurance, or of marine and transportation insurance, such limitation shall not be to a period of less than one year from the date of the loss."

months and even years in calculating the cause and extent of damage created havoc for the parties. It would be unrealistic to say that the physical damage that triggered the filing period was the occurrence of cracks in the silo walls. In fact, that was nothing more than the first link in the concatenation. Both parties assumed that the repairs undertaken in 1971 would place the building in acceptable condition. The *significant physical damage* was the omission of perhaps as much as a quarter of the reinforcing steel from the silo walls. This error resulted in a significant loss of structural integrity, of which the cracks were but an outward manifestation.

Both Robert Ager, CMG's attorney, and John Cope, the project manager, testified that they viewed the results of the slot cuts in 1972. Cope testified that this convinced him that a substantial amount of steel had been left out. The only conclusion that can be reached from all the evidence is that CMG learned of the omission of the steel in 1972. Its failure to bring suit until 1975, well past the 1–year time limit contained in the policy, bars any recovery.

The judgment is reversed and the case dismissed.

JAMES, A.C.J., and DORE, J., concur.

Reconsideration denied February 24, 1981.

Review denied by Supreme Court June 12, 1981.