111 Wn.2d 452 (1988)
760 P.2d 337
TRANSCONTINENTAL INSURANCE COMPANY, ET AL, Appellants,
v.
WASHINGTON PUBLIC UTILITIES DISTRICTS' UTILITY SYSTEM, ET AL, Respondents.
No. 54851-0.
The Supreme Court of Washington, En Banc.
August 18, 1988.
Lee, Smart, Cook, Martin & Patterson, P.S., by David L. Martin and Steven J. Jager, for appellants.
*454 Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, by Timothy J. Whitters and Thomas L. Palotas; Blair, Schaefer, Hutchison, Wynne, Potter & Horton, by David C. Hutchison, for respondents.
PEARSON, C.J.
Transcontinental Insurance Company and Columbia Casualty Company brought this declaratory action to determine whether certain insurance policies issued to the Washington Public Utility Districts' Utility System (WPUDUS) provide coverage for potential liability arising out of the Washington Public Power Supply System's $2.25 billion bond default. The trial court held that under the allegations of the complaints, one policy provided coverage. We affirm that decision, but hold the complaints allege facts which, if proved, would also trigger the coverage of another policy. We therefore affirm in part and reverse in part.
WPUDUS is an unincorporated association of public utility districts (PUD's) that formed a joint powers agreement in December 1976 to self-insure. The WPUDUS member PUD's, their officers, directors and employees are defendants in a myriad of lawsuits brought by WPPSS bondholders. The bondholders allege various state and federal securities claims, fraud, negligent misrepresentation and breach of contract. The record contains 13 separate complaints filed by numerous parties for damages arising out of the WPPSS bond default. See Haberman v. WPPSS, 109 Wn.2d 107, 744 P.2d 1032, 750 P.2d 254 (1987); Chemical Bank v. WPPSS, 102 Wn.2d 874, 691 P.2d 524 (1984), cert. denied, 471 U.S. 1065 (1985); Chemical Bank v. WPPSS, 99 Wn.2d 772, 666 P.2d 329 (1983).
The policies at issue here[1] are both "special excess liability policies" meant to provide coverage for losses in excess *455 of the $500,000 covered by the WPUDUS self-insurance agreement. The self-insurance agreement provides the first layer of coverage, and the excess policies provide a second layer of coverage up to the particular policy limit.
Transcontinental policy number SXP 358 41 98 was in effect from January 31, 1981, to January 31, 1982 (81/82 policy). It provided $500,000 in excess coverage. The policy stated that Transcontinental would indemnify WPUDUS for its ultimate net loss in excess of its self-insurance that WPUDUS became legally obligated to pay as damages because of personal injury or property damage caused by an occurrence. Endorsement 7 to the policy stated that, subject to the conditions of the policy, Transcontinental would also indemnify WPUDUS for any amount for which an officer, director, or employee became liable while acting in the scope of his duties.
For the next year, 1982-83, Transcontinental issued policy number SXP 358 42 34 (82/83 policy). This policy was similar to the 81/82 policy, but provided excess coverage of $19.5 million. The declarations page, as modified by endorsement, was the same as that in the 81/82 policy except for the coverage limit and a reference to public officials' errors and omissions coverage. Endorsement 13 to this policy contained language similar to endorsement 7 to the 81/82 policy except that it was subject to both terms and conditions of the policy. Both the 81/82 and the 82/83 policies contained the same definitions of "occurrence" and "property damage".
WPUDUS's broker notified Transcontinental of the WPPSS litigation in March 1983, seeking a determination of coverage under the policies for potential liability in excess of the self-insurance agreement limit. Transcontinental took the position that because none of the WPPSS suits involved allegations of personal injury or tangible property damage, no coverage existed under any of its *456 policies.[2] Transcontinental then filed this declaratory action to determine whether any of its policies provided coverage for WPUDUS, its members and their officers, directors and employees for claims made against them in the WPPSS-related litigation. WPUDUS counterclaimed that Transcontinental's and Columbia Casualty's denial of coverage constituted bad faith and violated the Consumer Protection Act.
The trial court held that only the 82/83 policy provided coverage and granted summary judgment accordingly. The court denied WPUDUS's consumer protection claim. The trial court also denied reconsideration.
Transcontinental appealed the trial court's finding of coverage under its 82/83 policy. Defendant WPUDUS cross-appealed the trial court's finding of no coverage under the 81/82 policy and its dismissal of the consumer protection claims. We accepted certification from the Court of Appeals.

I
[1, 2] The interpretation of insurance policies is a question of law. State Farm Gen. Ins. Co. v. Emerson, 102 Wn.2d 477, 480, 687 P.2d 1139 (1984). In construing the language of an insurance policy, the entire contract must be construed together so as to give force and effect to each clause. Morgan v. Prudential Ins. Co. of Am., 86 Wn.2d 432, 434, 545 P.2d 1193 (1976). If the language in an insurance contract is clear and unambiguous, the court must enforce it as written and may not modify the contract or create ambiguity where none exists. Morgan, at 435; see Greer v. Northwestern Nat'l Ins. Co., 109 Wn.2d 191, 198, 743 P.2d 1244 (1987). However, if a policy provision on its face is fairly susceptible to two different but reasonable interpretations, the policy is ambiguous and the court must *457 attempt to discern and enforce the contract as the parties intended. Morgan, at 435; Greer, at 198-200.
To determine the parties' intent, the court first will view the contract as a whole, examining its subject matter and objective, the circumstances of its making, the subsequent conduct of the parties, and the reasonableness of their respective interpretations. Greer, at 200. If the court determines that the policy remains ambiguous even after its consideration of the extrinsic evidence, the court will apply a meaning and construction most favorable to the insured, even though the insurer may have intended another meaning. Greer, at 201; Shotwell v. Transamerica Title Ins. Co., 91 Wn.2d 161, 167-68, 588 P.2d 208 (1978); Morgan, at 435.
Overall, a policy should be given a practical and reasonable interpretation rather than a strained or forced construction that leads to an absurd conclusion, or that renders the policy nonsensical or ineffective. Morgan, at 434-35; see also McDonald Indus. v. Rollins Leasing Corp., 95 Wn.2d 909, 913, 631 P.2d 947 (1981).

A
The 82/83 policy provides:
Company's Liability:
Item 2A. $19,500,000. Ultimate net loss as the result of any one occurrence because of personal injury or property damage, or public officials errors & omissions or any combination thereof.
Endorsement 7. The policy defines "occurrence" as
an accident, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage neither expected nor intended from the standpoint of the Insured ...
"Property damage" is defined as "physical injury to or destruction of tangible property".
The policy also provided by endorsement 13 that:
Subject to the terms and conditions of this policy it is agreed that the company will also indemnify the insured or any officer, director or employee of an insured public *458 utilities district for any amount which any officer, director or employee of an insured public utilities district shall become legally obligated to pay while acting within the scope of his or her duties as an officer, director or employee ...
Nothing herein shall serve to increase the company's limits of liability.
Transcontinental asserts that the phrase "subject to the terms... of this policy" limits the coverage of the endorsement to events arising out of an "occurrence" and resulting in tangible "property damage" as defined by the policy. Thus, Transcontinental argues endorsement 13 was meant only to clarify that officers, directors and employees of member PUD's are named insureds under the policy.
Essentially, Transcontinental reads endorsement 13 to say that officers, directors, and employees are covered for any amount they become legally obligated to pay which results from an accident resulting in tangible property damage neither expected nor intended. Transcontinental also contends the reference to "errors and omissions" in the endorsement to the declarations page was unintended. Transcontinental concludes that the policy does not cover any potential liability arising from the WPPSS litigation.
WPUDUS argues that Transcontinental's reading of endorsement 13 renders it meaningless. WPUDUS points out that officers, directors, and employees are already named as insureds in the policy section entitled "Persons or Entities Insured" which reads in relevant part:
(b) Each of the following is an insured under this policy ...
(2) ... (i) any executive officer, other employee, director or stockholder ... while acting within the scope of his duties as such...
WPUDUS argues that the only reasonable interpretation of the endorsement is that broader coverage was intended for officers, directors and employees while in the performance of their duties, especially in light of the policy's specific reference to "errors and omissions", which was never removed from the endorsement to the declarations page. *459 WPUDUS contends that coverage under endorsement 13 controls over the inconsistent "terms" of the policy definitions, especially that of property damage.
The trial court concluded that the policy language showed the parties intended endorsement 13 to do "something more than ... restate insureds who were already covered." We conclude the policy is ambiguous.

B
The parol evidence in the record, although not disputed, does not completely resolve the ambiguity. The evidence establishes that the parties were negotiating initially for something more than additional "named insured" language, but does not clearly establish what either party intended in the resulting policy.
Endorsement 13 to the 82/83 policy resulted from an extended series of negotiations beginning in mid-1981 when Employers Insurance of Wausau, through the American Public Power Association, offered to the members of WPUDUS an insurance policy which provided errors and omissions coverage for officers and directors. WPUDUS's broker told WPUDUS that it already had such coverage under the self-insurance agreement, and that the intent of the Transcontinental excess coverage was to follow the form of the self-insurance agreement.
Through an intermediary broker, WPUDUS's broker told Transcontinental of Employers Insurance of Wausau's proposal to WPUDUS. WPUDUS requested an endorsement incorporating certain language from the self-insurance agreement, apparently believing the language to provide similar coverage.[3]
Transcontinental replied on August 31, 1981:

*460 It may well be that the Insured is looking for Public Officials Errors and Omissions Liability and in order to try to resolve this question we would be prepared to delete the existing wording [and replace it] with the attached wording [referring to a Transcontinental form errors and omissions endorsement attached to letter].
On September 3, 1981, the intermediary broker again wrote to Transcontinental to explain that WPUDUS's broker did not want to incorporate fresh language such as that in the Transcontinental form endorsement because to do so would require much time and negotiation with each of the individual members of WPUDUS. The broker also said there was no evidence of directors' and officers' liability wording or intent "as such" in the WPUDUS self-insurance agreement, or its predecessor. The letter concluded with a request for an endorsement as previously requested by WPUDUS.
In a September 10, 1981, letter, a Transcontinental underwriter expressed confusion about what WPUDUS wanted to accomplish, saying he personally would be reluctant to endorse the policy as requested because he felt neither existing policy provided the type of coverage offered by the American Public Power Association, and that an endorsement incorporating the language of the WPUDUS self-insurance agreement would conflict with the purposes of the coverage.
In a September 25, 1981, telex to the intermediary broker, a Transcontinental underwriting supervisor summarized the situation and gave possible alternatives. The supervisor noted that the broker was
Attempting to head off an outside professional liab[ility] cover offer via another carrier. The extent of this coverage is unknown but the feeling is held that if [Transcontinental] can incorporate the essence of [the requested language from the WPUDUS self-insurance agreement], all will be well.
On October 5, 1981, Transcontinental offered to endorse the policy as requested by WPUDUS originally. WPUDUS accepted the next day. The endorsement, number 7, was *461 retroactive to the beginning of the 81/82 policy period. In early January 1982, Transcontinental and WPUDUS negotiated the 82/83 policy, which was essentially the same as the 81/82 policy but carried $19.5 million excess coverage. The new policy also contained the language of endorsement 7 to the 81/82 policy. In a letter notifying WPUDUS of the new policy, WPUDUS's broker pointed out that it contained "the endorsement referring to the errors and omissions coverage in the Self-Insurance Agreement so there should be no question about the total coverage in that area".
WPUDUS later requested a modification of this endorsement to reflect a statutory "good faith" requirement. The resulting endorsement, number 13, contained the requested change. It also added the words "terms and" to the first sentence, changing it to read: "Subject to the terms and conditions of this policy". (Italics ours.) This addition was not requested and apparently was never noticed by WPUDUS.
Other evidence in the record is similarly ambiguous. Transcontinental points out that WPUDUS paid no extra premium for the additional coverage allegedly provided by endorsement 13. WPUDUS, on the other hand, produced evidence that it was not "unusual for an insurer to issue an endorsement extending coverage to errors and omissions without requesting an additional premium, especially if the insured is a large and long time account." This was especially true because of the competitive market during the time of negotiations. We note that while Transcontinental makes much of the evidence showing confusion over the intended coverage, the record is devoid of evidence of negotiations regarding named insureds, the effect Transcontinental now asserts was intended in endorsement 13.
On the other hand, the record contains evidence that endorsement 13 uses language commonly associated with professionals' errors and omissions coverage. An expert for WPUDUS testified that an insurance underwriter would recognize the terms "good faith", "indemnify", and "within *462 the scope of duty" contained in endorsement 13 as indicia of errors and omissions coverage. In fact, both WPUDUS's broker and the intermediary broker for Transcontinental understood the policy to include errors and omissions coverage. A Transcontinental senior claims analyst also referred to errors and omissions coverage in the first letter denying coverage for WPPSS-related liability.
We conclude the extrinsic evidence does not resolve the ambiguity. At best, the evidence establishes that Transcontinental was aware WPUDUS was offered errors and omissions insurance by another company. It does not reveal the clear intentions of the parties. Therefore, we must construe the policy.

C
[3] Endorsements must be read together with the policy to determine the intent of the parties. An endorsement becomes a part of the insurance contract even if the result is a new and different contract. As endorsements are later in time, they generally control over inconsistent terms or conditions in a policy. 1 G. Couch, Insurance § 4:36 (2d rev. ed. 1984). See also, e.g., Holthe v. Iskowitz, 31 Wn.2d 533, 541-42, 197 P.2d 999 (1948); Miller v. Penn Mut. Life Ins. Co., 189 Wash. 269, 275-77, 64 P.2d 1050 (1937).
An endorsement attached to a policy, which expressly provides that it is subject to the terms, limitations and conditions of the policy, must be read with the policy and will not abrogate or nullify any provision of the policy unless it is so stated in the endorsement. However, if there is ambiguity arising because of the difference of language used in the endorsement and the body of the policy, or between two endorsements, the language of the contract is construed most strongly against the insurer. 1 G. Couch, at 404; see also Hilburn v. Citizens' Mut. Auto. Ins. Co., 339 Mich. 494, 498, 64 N.W.2d 702 (1954).
Here, the language of endorsement 13 purports to cover the insured for "any loss" "subject to the terms" of the *463 policy. The broad coverage implied by "any loss" directly conflicts with the limiting "subject to the terms" language. The policy predicates coverage on an "occurrence", which is defined as an accident resulting in "property damage", which in turn is defined as tangible property. Thus, while the "any loss" language of endorsement 13 would cover liability incurred for intangible property damage, the policy definition does not. In addition, the endorsement to the 82/83 policy's declarations page specifically refers to coverage for "public officials errors & omissions". A reading of endorsement 13 as subject to the terms of the policy would render both the declarations page and endorsement 13 meaningless. See Hilburn v. Citizens' Mut. Auto. Ins. Co., supra at 499 (endorsement providing coverage for the insured's personal losses superseded the policy's limitation to pay only for liability resulting from losses by others; any other interpretation would render the endorsement meaningless).
We conclude the reasonable meaning of the 82/83 policy as a whole is that it covers WPUDUS for liability resulting from personal injury and property damage in general, and that it covers officers, directors, and employees for any liability resulting from the performance of their duties in good faith.

D
The trial court did not address whether the 81/82 policy provided similar coverage. Instead, the trial court concluded that because the WPPSS suits alleged no event triggering coverage under the 81/82 policy, no coverage question arose. Because we hold that the underlying WPPSS suits do allege events potentially triggering liability under the 81/82 policy, we address the question of coverage.
The 81/82 policy is essentially identical to the 82/83 policy, with two exceptions: (1) it does not refer to public officials' errors and omissions in its declarations page; and *464 (2) the 81/82 policy's counterpart to endorsement 13 of the 82/83 policy, endorsement 7, was subject only to the "conditions" of the policy, not to its "terms".
Endorsement 7 states:
Subject to the conditions of this policy it is agreed that the company will also indemnify the insured for any amount which any officer, director or employee of a [sic] insured public utilities district shall become legally obligated to pay while acting within the scope of his or her duties as an officer, director or employee ...
Nothing herein shall serve to increase the company's limits of liability.
Unlike endorsement 13 to the 82/83 policy, endorsement 7 of the 81/82 policy does not refer to or limit its application to the "terms" of the policy. Instead, the "subject to the conditions" language refers to the policy section entitled "Conditions," which sets forth the insured's duties, describes the premiums, and refers to subrogation, appeals, actions against the insurer, etc.
Transcontinental argues that "subject to the conditions" should be read broadly to include the definitions of the policy. We find Transcontinental's argument unpersuasive in light of the specific policy section entitled "Conditions". This section of the policy is distinct from the section defining the terms of the policy.
We conclude that the 81/82 policy is not ambiguous. Endorsement 7 clearly provides coverage as stated, subject to the policy conditions. Overall, we conclude that both policies provide coverage for officers, directors and employees in their duties as such for liabilities arising out of the WPPSS-related litigation.

II
Having concluded that coverage exists, we must determine what events trigger that coverage. The trial court ruled that only one coverage-triggering event occurred  the *465 participants' failure, on January 22, 1983, to make payments as required by the Participants' Agreement.[4] The trial court noted that this was when the bondholders first knew their investments were in jeopardy. The trial court concluded that because this event "occurred" during the 82/83 policy period, coverage would be triggered under that policy only.
We first note that the policies define occurrence as "an accident ... which results, during the policy period, in personal injury or property damage neither expected nor intended". The endorsements at issue here, however, are not subject to this definition. As we concluded above, this definition of "occurrence" renders endorsement 13 a meaningless repetition of the named insured coverage already provided by the policy. Moreover, endorsement 7 to the 81/82 policy is unambiguously subject only to the conditions of the policy. We conclude that under the language of the endorsements, coverage is triggered by a good faith act by an officer, director, or employee in the scope of his duty that results, during the policy period, in that officer, director, or employee's liability to another. This definition parallels the consistent parts of the policies' definition of occurrence, while taking into account the language of the endorsements.
[4] This construction is also consistent with Washington case law holding that the time of an occurrence for insurance coverage purposes is determined by when damages or injuries took place. See Castle & Cooke, Inc. v. Great Am. Ins. Co., 42 Wn. App. 508, 517, 711 P.2d 1108, review denied, 105 Wn.2d 1021 (1986); see also Villella v. Public *466 Employees Mut. Ins. Co., 106 Wn.2d 806, 811, 725 P.2d 957 (1986); Cope Constr. v. American Home Assur. Co., 28 Wn. App. 38, 44, 622 P.2d 395 (1980); Swift v. American Home Assur. Co., 22 Wn. App. 777, 780, 591 P.2d 1216 (1979); Gruol Constr. Co. v. Insurance Co. of North Am., 11 Wn. App. 632, 636, 524 P.2d 427, review denied, 84 Wn.2d 1014 (1974).
Transcontinental first argues that the only such occurrence took place when the PUD's entered into the Participants' Agreement without authority on July 14, 1976, before WPUDUS was formed and before either Columbia Casualty or Transcontinental provided excess coverage. See Chemical Bank v. WPPSS, 102 Wn.2d 874, 691 P.2d 524 (1984), cert. denied, 471 U.S. 1065 (1985). Transcontinental contends that all alleged damages flowed from that single act, which constituted one cause and thus one occurrence.
Transcontinental relies on Truck Ins. Exch. v. Rohde, 49 Wn.2d 465, 303 P.2d 659, 55 A.L.R.2d 1288 (1956) wherein the insured's automobile had collided with three motorcycles within a few moments. The insured claimed that each collision was a separate occurrence. The court held, however, that because each collision resulted from one proximate, uninterrupted cause, the driver's loss of control, only one occurrence took place. Rohde, at 471.
We find Rohde distinguishable. Here, the bondholders' allegations in the WPPSS suits involve several types of injuries flowing from multiple, distinct events unlike the single auto accident in Rohde. Although the PUD's entrance into the Participants' Agreement may have been a cause for some damages alleged, other alleged causes potentially exist such as reliance on bond counsels' opinions that accompanied each bond issue stating that the Agreement was enforceable, or participants' failure to file a declaratory action to determine the enforceability of their agreement prior to the sale of the bonds. WPUDUS members may have potential liability for damages resulting from these events. Thus, while Transcontinental may be correct that entry into the Participants' Agreement was one event *467 triggering coverage, its argument does not establish that it was the only cause.
We are persuaded by WPUDUS's contention that the number of triggering events depends on the number of causes underlying the alleged damage and resulting liability. See, e.g., Michigan Chem. Corp. v. American Home Assur. Co., 728 F.2d 374, 383 (6th Cir.1984); Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co., 447 F.2d 204, 207 (5th Cir.1971) (separate sales of contaminated bird seed constituted separate occurrences); Liberty Mut. Ins. Co. v. Rawls, 404 F.2d 880, 881 (5th Cir.1968) (two occurrences where driver struck two cars, but gained control between first and second impact).
WPUDUS asserts that the bondholders allege injuries resulting from multiple causes, some separate and independent, others continuing through several policy periods, and still others long-standing, existing before and during the policy periods. If proved, any of these causes could trigger coverage under one, or both, policies, depending on when the resulting injury occurred. We agree.
In Michigan Chem. Corp. v. American Home Assur. Co., supra, for example, the court held that separate shipments of contaminated livestock feed constituted separate occurrences. The court noted that each shipment was a separate act out of which liability could result. The court concluded that the date of the occurrence for coverage purposes depended on the time of the actual injury resulting from the shipment. Michigan Chem. Corp., at 381.
In Gruol Constr. Co. v. Insurance Co. of North Am., supra, a construction company was sued for negligent construction resulting in dry rot. The building was completed in 1964 and the damage discovered in 1968. The builder had been insured by three separate insurers during the relevant period. The court held that although the alleged negligence occurred during the first policy period, the damage was continuously developing during all three periods, resulting in coverage under each. Gruol, at 636.
*468 Castle & Cooke, Inc. v. Great Am. Ins. Co., supra, involved insurance coverage for long-standing discriminatory conduct beginning before the relevant policy period. The insurer argued that because the discrimination occurred initially before the policy coverage was effective, it had no liability under the policy. The court disagreed, holding that coverage existed because some of the injuries resulting from the discrimination took place during the policy period. Castle & Cooke, at 517. See also Villella v. Public Employees Mut. Ins. Co., supra at 814 (injury or loss, "however minute", must occur during the policy period to trigger coverage).
WPUDUS points out that all these types of causation are alleged in some form in the underlying WPPSS litigation. For example, the WPPSS plaintiffs allege several distinct and potentially unrelated causes for their injuries: negligent forecasting of power demands, negligent failure to ensure that the Participants' Agreement guaranteeing the bonds was enforceable, mismanagement of the construction of the mothballed nuclear plants, and negligent misrepresentations regarding the participants' willingness or ability to repay the bond obligations.
There were 14 separate bond issues. Each carried its own set of financial statements, opinion letters, and disclosures. Various claims are alleged by purchasers of bond issues occurring at different times. The multiple bonds issues are analogous to the bad feed shipments in Michigan Chem. Corp. v. American Home Assur. Co., supra; each is a potentially distinct cause resulting in the bondholder's injuries.
The bondholders have also alleged conduct that, if proved, caused a continual decline in bond values analogous to the continually developing damage in Gruol Constr. Co. v. Insurance Co. of North Am., supra. The bondholders claim that WPPSS negligently saturated the financial markets with bonds, and that board members negligently supervised the bond issues. The continuing news of cost overruns, construction delays and increasing speculation *469 over the enforceability of the Participants' Agreement all conceivably were contributing causes of the decline in bond prices. Many of these events occurred during the policy periods involved here.
Finally, the long-standing conduct of the WPPSS defendants alleged to be a cause of damage is like the long-standing discrimination found in Castle & Cooke. Although the alleged acts may have taken place before the policy periods involved here, some of the acts, such as the preparation of the accompanying materials, were relied upon in each issue of bonds, conceivably causing damage during one or both policy periods.
We find Transcontinental's remaining arguments without merit. Its argument that coverage is triggered at the time injuries are first manifested was expressly rejected by the court in Castle & Cooke, at 516, as unpersuasive and inconsistent with Washington case law. Moreover, Transcontinental's contention that coverage is triggered at the time of the error or omission ignores the language of the endorsements. Neither endorsement predicates liability on an error or omission by the insured. Instead, each provides that Transcontinental will indemnify any officer, director, or employee for "any amount" he becomes legally obligated to pay while acting in the scope of his duties. The cases cited by Transcontinental in support of this argument all involve specific policy language in which coverage is triggered by "acts or omissions" during the policy period, as distinguished from the language of the endorsements here. See Schultheis v. Centennial Ins. Co., 108 Misc.2d 725, 727, 438 N.Y.S.2d 687 (1981) ("malpractice, error or mistake ... during the policy period"); Phoenix Phase I Assocs. v. Ginsberg, Guren & Merritt, 23 Ohio App.3d 1, 3, 490 N.E.2d 634 (1985) ("professional services performed ... during the period of this Insuring Agreement"); Chamberlin v. Smith, 72 Cal. App.3d 835, 845, 140 Cal. Rptr. 493 (1977) ("acts or omissions ... during the policy period"). Although Transcontinental relies heavily on the federal court decision that bondholders were injured upon *470 purchase, that decision did not hold that all damages were suffered on purchase. In arguing that neither policy provides coverage for acts intended or expected from the standpoint of the insured, Transcontinental overlooks the negligence claims filed by the WPPSS bondholders.
Finally, Transcontinental argues that because both policies at issue limit the amount of coverage arising out of each "occurrence", only one policy or the other can provide coverage for events caused by the same act. We disagree. Both policies state:
For the purpose of determining the limit of The Company's liability, all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
Transcontinental apparently suggests that the 81/82 policy limits the coverage of the 82/83 policy. When read in the context of the policy as a whole, this policy provision determines the limits of Transcontinental's liability per occurrence per policy year.
We conclude that coverage may exist on the basis of the bondholders' allegations of multiple separate causes, continuing causes, or long-standing causes resulting in injury during the policy periods. If proved, these allegations would trigger liability under both policy years.

III
[5] Finally, we agree with the trial court that Transcontinental's actions did not rise to the level of bad faith so as to violate the Consumer Protection Act, RCW 19.86. A denial of coverage based on a reasonable interpretation of the policy is not bad faith, Castle & Cooke, Inc. v. Great Am. Ins. Co., 42 Wn. App. 508, 518, 711 P.2d 1108, review denied, 105 Wn.2d 1021 (1986), and even if incorrect, does not violate the Consumer Protection Act if the insurer's conduct was reasonable. Villella v. Public Employees Mut. Ins. Co., 106 Wn.2d 806, 821, 725 P.2d 957 (1986). Here, the record does not establish that Transcontinental's actions *471 were unreasonable, frivolous, or untenable. See Felice v. St. Paul Fire & Marine Ins. Co., 42 Wn. App. 352, 361, 711 P.2d 1066 (1985), review denied, 105 Wn.2d 1014 (1986).

IV
The trial court's summary judgment dismissing WPUDUS's Consumer Protection Act claims is affirmed. In addition, the trial court's summary judgment that the 82/83 policy provides coverage is affirmed. The trial court's summary judgment denying coverage under the 81/82 policy is reversed.
UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, and DURHAM, JJ., and PATRICK and SWYTER, JJ. Pro Tem., concur.
Reconsideration denied December 8, 1988.
NOTES
[1] Although the insurers sought declaratory rulings on their policies issued to WPUDUS during policy years 1977 through 1984, the policies in dispute here are those involving policy years 81/82 and 82/83 issued by Transcontinental.
[2] Transcontinental initially had accepted liability under the 82/83 policy for claims made against WPUDUS by the City of Bonners Ferry. The record is unclear as to Transcontinental's present stance on this claim.
[3] WPUDUS had requested Transcontinental to include the language of paragraph 7 of the WPUDUS self-insurance agreement, which provided in part:

The System will also pay, subject to the other provisions of this Agreement, any amount which any officer, director or employee of a PUD shall become legally obligated to pay while acting within the scope of his duties as an officer, director or employee during the time that the PUD was a party hereto ...
[4] The Participants' Agreement was an agreement between certain cities, PUD's, irrigation districts, and electric cooperatives and WPPSS. It provided that these participants would pay for their share of project "capability" whether or not power was ever produced by nuclear plants 4 and 5. The agreement provided an indirect guaranty of the bonds issued. See Haberman v. WPPSS, 109 Wn.2d 107, 115, 744 P.2d 1032, 750 P.2d 254 (1987). This court later determined that these agreements were unenforceable. See Chemical Bank v. WPPSS, 102 Wn.2d 874, 691 P.2d 524 (1984), cert. denied, 471 U.S. 1065 (1985).