IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| MOUNT ZION LUTHERAN CHURCH, | ) | No. 78107-3-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHURCH MUTUAL INSURANCE | ) | |
| COMPANY, a foreign corporation, | ) | |
| | ) | |
| Respondent. | ) | FILED: March 18, 2019 |
| | ) | |

ANDRUS, J. — Mount Zion Lutheran Church appeals a summary judgment determination that its insurer, Church Mutual Insurance Company, has no obligation to reimburse it for certain costs incurred when it remodeled its fire-damaged church building. We affirm.

## FACTS

On May 7, 2014, a fire caused significant interior damage to Mount Zion Lutheran Church in Mountlake Terrace. Mount Zion was insured by Church Mutual Insurance Company under Policy Number 0067342-02-381415 (the Policy). Under the Policy, Mount Zion could collect the "Actual Cash Value" (ACV) of the "Covered Property," regardless of whether it chose to repair or replace the church. If Mount Zion chose to rebuild, it could file a claim for repair or replacement costs exceeding the ACV.

Church Mutual hired J.S. Held Construction Consulting to prepare a scope of repair and cost estimate. J.S. Held estimated the cost to replicate the church building as it existed before the fire to be $729,106.42 (the Replacement Cost Valuation or RCV). J.S. Held estimated the ACV of the church to be $593,361.66, which Church Mutual paid to Mount Zion. The Policy allowed Church Mutual to withhold the difference between the RCV and ACV, approximately $135,744, until Mount Zion completed the repairs.

J.S. Held's estimate included the cost of replacing arched glulam beams in the church sanctuary and replacing the sanctuary roof, a cost of over $196,000. Slaed Spiller, an independent adjuster hired by Church Mutual, inspected the church, including the glulam beams, and discussed their replacement with Pastor Frank Paine. Pastor Paine indicated to Spiller that he preferred to repair, rather than replace, the glulam beams, as replacement would require removal of the church's roof. Church Mutual hired Rimkus Consulting Group to assess the glulam beams, and it concluded they did not need to be replaced.

By the end of June 2014, Mount Zion had four bids, all of which reflected the cost of repairing, rather than replacing, the glulam beams. None included replacing the entire sanctuary roof. The bids ranged from $363,989, to $426,716, well below the ACV already paid to the church.

In late July 2014, Mount Zion retained a public adjuster, Drew Lucurell, to assist with its insurance claim. Church Mutual's adjuster, Spiller, testified that Lucurell claimed the glulam beams had to be replaced, rather than repaired. Although Rimkus and the four bidding contractors did not deem replacement of the

beams to be necessary, Church Mutual acquiesced and allowed Mount Zion to replace them. J.S. Held did not modify its RCV.

Mount Zion retained Seattle Remodeling Company to perform the repairs. Spiller performed a routine post-repair inspection of the church on October 28, 2015, and he discovered that the glulam beams had been repaired, not replaced.

Mount Zion prepared a replacement cost claim in April 2016 in which it reallocated the cost estimated to replace the glulam beams and sanctuary roof to a set of "substitute expenditures." The claim is not a part of the record. But Church Mutual submitted documents from Lucurell's files indicating the church spent a total of $750,682.30 in repair and replacement costs. From what we can glean from the record, the contractor granted the church a credit of $53,874 for eliminating work to replace the glulam beams, identified supplemental expenditures of $28,432, and included additional costs of $75,500 for "extras" requested by the church. Church Mutual asserts on appeal it reimbursed the church for the cost of repairing the glulam beams, but we cannot find any evidence in the record to support this contention.

Mount Zion presented evidence that it elected to refurbish, rather than replace, the arched glulam beams in the sanctuary because removing the roof would have added significant time to the reconstruction timeline. Believing it was entitled to the funds to install new glulam beams, Mount Zion chose to make "substitute expenditures" with funds otherwise allocated for the beam replacement.

For example, Mount Zion presented evidence that the original church had a perpendicular wing with offices and a small kitchenette, which were irreparably

damaged. Mount Zion chose to replace the old kitchenette with a full-size kitchen, redesigning it to make it more functional for the church's current needs. According to Lucurell's documents and Church Mutual's adjuster Spiller, the full-size kitchen had upgraded kitchen cabinets, an upgraded sink and faucets, new self-closing drawers, and upgraded appliances.

Church Mutual presented evidence that Mount Zion also upgraded the hardware on the front entry doors, upgraded the flooring and base trim in the sanctuary and foyer, upgraded wall and ceiling insulation, reframed the mezzanine for use as storage, installed underground conduits for phone and internet cables, added custom built shelving to a meeting room and classroom, refurbished a street sign not damaged in the fire, and upgraded lighting in the foyer, fellowship building, and sanctuary.

Church Mutual refused to pay the cost of replacing beams the church did not replace. It also refused to reimburse the church's "substitute expenditures" as "unnecessary" under the Policy.

Mount Zion sued Church Mutual, alleging breach of contract, breach of the duty of good faith and fair dealing, and violations of the Washington Consumer Protection Act (CPA) and Washington Insurance Fair Conduct Act (IFCA). Mount Zion filed a "motion for legal ruling regarding replacement cost coverage," arguing it was entitled under the Policy to the full amount of the RCV, regardless of its decision not to replace the sanctuary beams. The trial court denied Mount Zion's motion, holding it is "not entitled to Replacement Cost Coverage for any substituted

costs incurred that were unnecessary to repair or replace the lost or damaged portions of the church building." Mount Zion appeals.

## ANALYSIS

The sole issue on appeal is whether Mount Zion is entitled to receive the full RCV calculated by Church Mutual under the Policy.

### Standard of Review

This court reviews de novo an order granting or denying summary judgment. Ruvalcaba v. Kwang Ho Baek, 175 Wn.2d 1, 6, 282 P.3d 1083 (2012). The trial court's ruling was based on an interpretation of the Policy. Interpretation of an insurance contract is also a question of law we review de novo. Kut Suen Lui v. Essex Ins. Co., 185 Wn.2d 703, 710, 375 P.3d 596 (2016).

### Rules of Construction or Interpretation of Insurance Contracts

This appeal involves the proper interpretation of section C, paragraph 7 of the Policy. This court construes insurance policies as contracts. Id. at 710. In construing the language of an insurance policy, its provisions must be construed together so as to give force and effect to each clause. Transcon. Ins. Co. v. Wash. Pub. Util. Dist. Util. Sys., 111 Wn.2d 452, 456, 760 P.2d 337 (1988). When this court interprets an insurance policy, it gives it "a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." Kut Suen Lui, 185 Wn.2d at 710 (internal quotation marks omitted) (quoting Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wn.2d 618, 627, 881 P.2d 201 (1994)). If the language is clear and unambiguous, the

court must enforce it as written and may not modify the contract or create ambiguity where none exists. Transcon. Ins. Co., 111 Wn.2d at 456.

Conversely, if a policy provision is, on its face, susceptible to multiple but reasonable interpretations, the policy is ambiguous, and the court must attempt to discern the intent of the parties and enforce the contract. Id. at 456-57. A court may rely on extrinsic evidence of the intent of the parties to resolve any ambiguity. Quadrant Corp. v. Am. States Ins. Co., 154 Wn.2d 165, 171-72, 110 P.3d 733 (2005). Any ambiguity remaining after examination of the extrinsic evidence is resolved against the insurer and in favor of the insured. Id. But the expectations of the insured cannot override the plain language of the contract. Id.

<u>Relevant Insurance Provisions</u>

Section C, paragraph 7 of the Policy provides:

**C. LOSS CONDITIONS**

. . .

7. Valuation.

> a. Replacement Cost. If Replacement Cost is shown in the Declarations Page as applicable to Covered Property, we will determine the value of Covered Property in the event of loss or damage as follows:
>
> (1) At Replacement Cost (without deduction for depreciation) as of the time of loss or damage . . .
>
> (2) You may make a claim for loss or damage covered by this insurance on an "Actual Cash Value" basis instead of on a Replacement Cost basis. In the event you elect to have loss or damage settled on an "Actual Cash Value" basis:
>
> > (a) We will then determine the value of Covered Property on an "Actual Cash Value" basis when applying the Coinsurance Condition;

(b) You may still make a claim on a Replacement Cost basis if you notify us of your intent to do so . . .

(3) We will not pay on a Replacement Cost basis for any loss or damage:

**(a) Until the lost or damaged property is actually repaired or replaced; and**

(b) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

(4) We will not pay more for loss or damage on a Replacement Cost basis **than the least of:**

(a) The Limit of Insurance applicable to the lost or damaged property;

(b) The cost to replace "on the same premises" the lost or damaged property;

1) Of comparable material and quality; and
2) Used for the same purpose; or

(c) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

The term "on the same premises" is a limitation on the amount of loss or damage we will pay. It does not require you to replace lost or damaged property at the same site.

(emphasis added).

Mount Zion contends the trial court erred in ruling it had no right to receive the full RCV amount. We conclude, however, that Mount Zion is not entitled to the full amount of the RCV because section C.7.a.(3)(a) of the Policy limits Church Mutual's obligation to pay for any loss until the lost or damaged property is actually repaired or replaced.

In Hess v. N. Pac. Ins. Co., 122 Wn.2d 180, 859 P.2d 586 (1993), the Washington Supreme Court held that an insurer had no obligation to pay full

replacement cost value of a cabin the insured chose to neither rebuild nor replace. Id. at 188. A policy provision stated that the insurer would pay no more than the actual cash value of the damage unless the "actual repair or replacement [was] complete." Id. at 184. This language unambiguously capped the insurer's liability at the actual cash value of the cabin until the cabin was repaired or replaced. Id. at 188.

Hess supports the trial court's interpretation of the Policy. As in Hess's policy, section C.7.a.(3)(a) of the Policy places a condition on Church Mutual's obligation to make any payment under section C.7.a.(4). Church Mutual has no obligation to pay on a replacement cost basis for any lost or damaged property that is not repaired or replaced. This language is not ambiguous. Mount Zion is not entitled to the replacement cost of glulam beams it chose not to replace.

Mount Zion further argues there is no basis for considering the glulam beams separately from the building to which they are attached because they are both "Covered Property" under the Policy. We disagree.

First, under section C.7.a.(2) of the Policy, the insured has the option of making a claim for loss or damage on an ACV basis instead of on a replacement cost basis. If this option is selected, section C.7.a.(2)(a) requires the insurer to determine the ACV of the "Covered Property." The "Covered Property" here is the church and all of its component parts, and the ACV reflects that value.

However, if the insured opts to make a claim on a replacement cost basis, as Mount Zion has done here, section C.7.a.(4) requires the insurer to reimburse for costs incurred to repair or replace "the lost or damaged property." It does not

require payment to repair or replace "the Covered Property." While the ACV explicitly covers the entire building and all of its component parts as one unit, the RCV explicitly covers only lost or damaged property within the Covered Property.

Second, although the Policy does not define "lost or damaged property," it uses this phrase repeatedly throughout the Policy in contexts that undercut Mount Zion's argument. For example, under section C.3.a.(4) of the Policy, insureds are required to provide "complete inventories of the damaged and undamaged property," and if possible, to set aside "damaged property" for examination by the insurer. The Policy clearly distinguishes between components of a building that have been damaged and are in need of repair or replacement from undamaged components of that same building.

It is a fair, reasonable, and sensible construction of the Policy to consider the arched glulam beams separately from the rest of the lost or damaged property within the church building when determining how to compute replacement costs due to Mount Zion.

Even though Mount Zion is not entitled to the full RCV because it did not replace the glulam beams, it may nevertheless be entitled to reimbursement for its "substitute expenditures" if they were "necessary" to replace lost or damaged property as set out in Paragraph 7.a.(4)(c).

Mount Zion argues the word "necessary" cannot be interpreted to require it to "replicate" the preexisting structure as a condition precedent to receiving replacement cost proceeds. Mount Zion is correct; there is nothing in the Policy requiring Mount Zion to rebuild the church, its office, and its kitchen in the exact

same configuration as existed before the fire. But Church Mutual is not advancing such a narrow construction of the Policy.

Mount Zion further asks this Court to adopt a "functional similarity" test in determining whether its remodeling was "necessary." It argues it should be reimbursed the full cost of its upgraded kitchen because what it built was "functionally similar" to the property lost or damaged by fire. Mount Zion relies on several federal and out-of-state cases for this argument. See Fitzhugh 25 Partners, L.P. v. KILN Syndicate KLN 501, 261 S.W.3d 861 (Tex. App. 2008) (insured's contention that purchasing an office park was a "replacement" for a multi-family apartment complex destroyed by fire was rejected because the word "replacement" in an insurance policy inherently contains the element of functional similarity); Seeber v. Gen. Fire and Cas. Co., 19 N.E.3d 402, 411-12 (Ind. App. 2014) ("replacement" coverage did not permit insured to replace destroyed commercial property with residential condominiums because properties were not used for same purpose); SR Int'l Bus. Ins. Co., Ltd. v. World Trade Cent. Prop., LLC, 445 F. Supp. 2d 320, 333 (S.D.N.Y. 2006) (in the context of determining whether non-removable tenant improvements should be included in the insurer's hypothetical replacement cost estimate, the court said "replacement property need only be 'functionally similar' to its predecessor, [and] it is inevitable that certain elements of the destroyed property will not be reproduced.").

None of these cases address the meaning of "necessary to repair or replace lost or damaged property." Nor do they conclude that an insurer is legally obligated to reimburse an insured for the cost of improvements that did not pre-exist the fire.

We conclude the Policy does not impose on Church Mutual the obligation to pay for Mount Zion's remodeling choices just because the remodeled space serves the same function as the old. Church Mutual has the contractual right to evaluate each line item of Mount Zion's insurance claim and to determine (1) whether there was lost or damaged property; and (2) whether the amount spent by Mount Zion was necessary to repair or replace that lost or damaged property.

Affirmed.

WE CONCUR:

Andrus, J.

Appelwick, C.J.