PHOENIX PHASE I ASSOCIATES, APPELLEE AND CROSS-APPELLANT, *v.* GINSBERG, GUREN & MERRITT ET AL.; AMERICAN HOME ASSURANCE COMPANY, APPELLANT AND CROSS-APPELLEE.■

(No. 48498—Decided March 4, 1985.)

*Craig Spangenberg,* for Phoenix Phase I Associates.

*Frederick P. Vergon, Jr.,* for American Home Assurance Company.

*James W. Barnhouse,* for St. Paul Fire & Marine Insurance Company.

*Jason C. Blackford* and *Brian M. Eisenberg,* for Ginsberg, Guren & Merritt.

*Richard E. Guster,* for Travelers Indemnity Company.

CORRIGAN, C.J. This action, originally filed in 1975, involves a comprehensive and complex real estate transaction in which the law firm of Ginsberg, Guren & Merritt was retained to provide a wide range of professional services. In the fall of 1973, however, the transaction began experiencing problems, and by the spring of 1974, it was in a shambles.

The complaint filed in the case alleged that Ginsberg, Guren & Merritt committed malpractice in the course of rendering legal services regarding the transaction. Specifically, the complaint stated that the law firm failed to have a title search made, failed to draft and

secure a deed for property involved in the transaction, failed to insure that investor funds were used for the proper purposes, and failed to advise its clients of rescission rights once it was apparent that the deal was in ruins.

The case went to trial before a jury, and on July 1, 1983, a general verdict was entered against Ginsberg, Guren & Merritt in the amount of $1,208,496.

After the conclusion of the trial, the original plaintiff in the action, Phoenix Phase I Associates ("Phoenix"), filed a supplemental action against four insurance companies which, at various times during the course of the real estate transaction, had provided liability insurance to the law firm. Phoenix was seeking a determination by the court as to which policy or policies would go toward satisfying the judgment against the firm. Of the four companies named in the action, the court found that two, St. Paul Fire & Marine Insurance Company ("St. Paul") and American Home Assurance Company ("American"), were responsible for Ginsberg, Guren & Merritt's liability. The court held that St. Paul was responsible for $164,556 of the judgment while American was responsible for $1,043,940.

This appeal was not brought by the law firm challenging the jury verdict. Rather, American, as appellant, and Phoenix, as appellee and cross-appellant, are challenging several aspects of the court's decision regarding insurance coverage. We will first address the assignments of error of American, which are as follows:

"I. The trial court erred in granting judgment in favor of plaintiff-appellee against new-party defendant-appellant, American Home Assurance Company, in determining that the American Home excess policy of insurance provided excess liability insurance coverage to the defendant, Ginsberg, Guren & Merritt for the claims against it by the plaintiff-appellee, Phoenix Phase I Associates.

"II. The trial court erred in not apportioning insurance coverage as between the St. Paul primary and excess policies of insurance and the American Home policy of excess insurance."

I

The gist of American's first assignment of error is that it should not have been held financially responsible for any part of the judgment rendered against the law firm. It contends that sole responsibility fell on St. Paul.

St. Paul provided the law firm with a primary coverage liability policy for the period of September 15, 1972 until November 1, 1973. The limit of that policy was $100,000 per occurrence. The relevant sections of that policy provide in part:

"COVERAGE

"The Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages arising out of the performance of professional services for others in the Insured's capacity as a lawyer and caused by the Insured or any other person for whose acts the Insured is legally liable. (The performance of professional services shall be deemed to include the Insured's acts as an administrator, conservator, executor, guardian, trustee or any similar fiduciary capacity, but only to the extent for which in the usual attorney-client relationship the Insured would be legally responsible as attorney for a fiduciary.)

"* * *

"1. LIMIT OF LIABILITY. The limit of liability stated under the Lawyers Professional Liability section of the Declarations as applicable to 'each occurrence' is the limit of the Company's liability for all damages arising out of the same professional services regardless of the number of claims or claimants. If more than one insured is included in this Insuring Agreement the

limit of liability shall apply separately to each.

"* * *

"5. POLICY PERIOD, TERRITORY. This Insuring Agreement applies within the United States of America, its territories or possessions or Canada to professional services performed for others (a) during the period of this Insuring Agreement, (b) prior to the effective date of this Insuring Agreement if claim is made or suit is brought during the period of this Insuring Agreement and providing the Insured had no knowledge or could not have reasonably foreseen any circumstances which might result in a claim or suit at the effective date of this Insuring Agreement. With respect to an Insured who becomes an Insured under this Insuring Agreement subsequent to its effective date, the Insuring Agreement period under (a) and (b) shall begin as of that effective date."

Additionally, the law firm was covered by a St. Paul excess policy for the period of September 15, 1972 until September 15, 1973. The coverage terms of that policy were identical to those in the St. Paul primary policy, but the policy only came into play once the $100,000 limit of the primary policy was exceeded. The excess policy provided up to $1,000,000 of coverage.

American argues that the law firm's malpractice occurred during the period when it was insured solely by St. Paul. It contends that the law firm prepared all of the relevant documents for the transaction in the spring and summer of 1973 and never took the proper steps to insure that the statements made in those documents, and particularly, the offering circular, were true before it permitted the Phoenix investors to start investing their money in the real estate project in August 1973. American thus maintains that, since the malpractice of the law firm occurred during the period when it was insured by St. Paul, St. Paul should bear lone financial responsibility for the judgment against the firm.

We agree with American that malpractice occurred when the law firm allowed investor money to start flowing in without having first made sure that the entire deal was in proper order, and St. Paul was responsible for the two people who invested during the period of its primary policy. However, we do not agree that the malpractice ended as soon as the firm gave the go-ahead for the Phoenix investors to begin buying into the real estate project. To the contrary, the law firm's malpractice was ongoing well into the period of the American excess policy, which covered the law firm from September 15, 1973 until September 15, 1974, as the firm continued to allow persons to invest in a deal that was falling apart and never took the necessary steps to protect those persons. Had the law firm, at some point shortly *after* the American coverage began, discovered the true facts about the real estate transaction, it could have acted in time to protect a large number of investors. It would then have been *irrelevant* to those investors that the law firm may have been negligent back in August 1973. The true malpractice as to those investors was when the law firm allowed them to invest when it should have known better. Thus, American was rightfully held responsible for the ongoing malpractice that occurred during its policy period.

Furthermore, the third charge in the complaint against the law firm was that it committed malpractice when it failed to advise the Phoenix investors to rescind in the spring of 1974 when the transaction was dead. As the jury returned a general verdict, it is unknown whether its members considered this charge as one of the bases for their verdict. However, the court found that there was sufficient evidence to establish the veracity of the charge. Therefore, since this malpractice occurred solely during the American policy

period, on this basis alone, American could be held responsible for the judgment.

Thus, for at least two separate reasons, the law firm committed malpractice during the American policy period. The first assignment of error is not well-taken.

## II

American next asserts that the court erred in failing to apportion insurance coverage between the St. Paul primary and excess policies and the American excess policy. It supports its position with the Ohio Supreme Court's decision in *Buckeye Union Ins. Co.* v. *State Auto. Mut. Ins. Co.* (1977), 49 Ohio St. 2d 213 [3 O.O.3d 330]. The syllabus in that case provides:

"Where two insurance policies cover the same risk and both provide that their liability with regard to that risk shall be excess insurance over other valid, collectible insurance, the two insurers become liable in proportion to the amount of insurance provided by their respective policies."

First, the St. Paul *primary* and American excess policies overlapped in coverage between September 15, 1973 and November 1, 1973. However, the St. Paul primary policy did *not* provide that its liability with regard to any risk that occurred during that period would be excess to the liability of any other policy covering the same risk during the same period. To the contrary, American's excess coverage was only triggered once the limits of St. Paul's primary coverage had been reached. Thus, *Buckeye Union* is inapplicable to these two policies.

Second, it could be said that both the St. Paul and American excess policies covered the first two investors: the St. Paul policy in regard to the malpractice of the law firm in allowing them to invest originally, and the American policy in regard to the failure of the law firm to advise them to rescind in the spring of 1974. However, *neither* excess policy

went into effect regarding these two investors as the St. Paul *primary* policy completely covered their loss. The formula set forth in *Buckeye Union* is inapplicable in this instance as well. Therefore, American's second assignment of error is without merit.

## III

In its cross-appeal, Phoenix assigns the following error:

"The trial court erred to the prejudice of plaintiff-cross-appellant in dividing total liability between to [*sic*] insurance carriers so that the primary carrier was charged more than its limit of liability and the excess carrier, defendant-cross-appellee, was undercharged by $64,556 of the excess balance."

The basic contention of Phoenix is that the $100,000 limit of St. Paul's primary policy covered both principal loss *and* interest. The investors therefore assert that the trial court erred in holding St. Paul liable for $64,556 in interest on top of the $100,000 limit of its policy. They argue that American should have to pay any excess over the $100,000 limit. It should be noted that St. Paul settled its liability with Phoenix for $161,500. Phoenix maintains that the $61,500 that St. Paul allegedly overpaid, minus $7,000 in post-judgment interest that St. Paul was obligated to pay, can and should be credited toward the liability of American. American would thus be liable for $10,056, plus post-judgment interest.

The interest that was awarded by the trial court in the instant case was compensatory, non-statutory interest. As such it constituted part of Phoenix's damage award. See *Lane & Bodley Co.* v. *Day* (1921), 13 Ohio App. 476; *Lawrence RR. Co.* v. *Cobb* (1879), 35 Ohio St. 94. Since St. Paul's primary policy covered Ginsberg, Guren & Merritt's liability for "damages" without specific reference to what type of damages, we agree with Phoenix that, in

this case, St. Paul's liability should not have exceeded $100,000 (exclusive of post-judgment interest). American is therefore liable for the excess over the $100,000 limit of St. Paul's primary policy, and the $54,500 that the investors have already received over what St. Paul was legally obligated to pay will be credited toward that liability.

We feel constrained to note, however, that had the interest in this case been awarded pursuant to R.C. 1343.03, the results would have been different. The primary, if not the sole, purpose of that statute is to encourage the settlement of lawsuits. We therefore find it repugnant to the purpose of the statute that an insurance company should be permitted to delay settlement efforts, or fail to make any settlement efforts at all, and limit its liability to the maximum stated in its policy. Accordingly, an insurance company can be held liable for prejudgment interest pursuant to R.C. 1343.03 in excess of any stated limits in its policy.

Phoenix's assignment of error is well-taken. For the reasons adduced herein, the judgment of the trial court, as modified, is affirmed.

*Judgment modified and, as modified, affirmed.*

PATTON, J., concurs.

NAHRA, J., dissents.

NAHRA, J. I respectfully dissent. I agree with the courts in other jurisdictions which have decided this issue that in professional liability policies similar to St. Paul's, the date of the negligent act, error or omission is the insuring event and not the date of damage. See, *e.g.,* *Arant* v. *Signal Ins. Co.* (1977), 67 Cal. App. 3d 514, 136 Cal. Rptr. 689; *Passanante* v. *Yormark* (1975), 138 N.J. Super. 233, 350 A. 2d 497. It is undisputed that the negligent performance of professional services arose during the spring and summer of 1973 during St. Paul's coverage and not during American's coverage. St. Paul's policy provides that it will be liable for *all* damages arising out of those negligent professional services and I would so hold even though not all potential plaintiffs were then identifiable. Had the law firm issued the offering circular (admittedly malpractice) and done nothing further, I believe those plaintiffs who put up their money after the expiration of St. Paul's policy should still have recovered from St. Paul for the malpractice which took place during St. Paul's policy period.