**In re BAKER & GETTY FINANCIAL SERVICES, INC., et al., Debtors.**

**Carl D. RAFOTH, Trustee, Plaintiff,**

**v.**

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Defendant.**

**Bankruptcy No. B87–00074–Y.
Adv. No. 87–0118.**

United States Bankruptcy Court,
N.D. Ohio.

Oct. 20, 1988.

Carl D. Rafoth, Youngstown, Ohio, trustee/plaintiff.

Russell A. Kelm, Richard A. Frye and Daniel R. Swetnam, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, for plaintiff.

Mark O'Neill, Cleveland, Ohio, for NUFIC.

Conrad J. Morgenstern, U.S. Trustee, Cleveland, Ohio.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This cause came before the Court on the Trustee's adversary Complaint filed on December 8, 1987. The Complaint seeks (1) a declaratory judgment finding the Plaintiff's loss to be covered under a securities dealer blanket bond issued by NATIONAL UNION FIRE INSURANCE COMPANY ("NUFIC"); and (2) an Order directing NUFIC to pay the Trustee One Million & 00/100 Dollars ($1,000,000.00), plus interest, court costs and attorney fees. The Court finds this is a core proceeding pursuant to 28 U.S.C. Sec. 157 for the reasons set forth in the Memorandum Opinion and Order entered June 30, 1988. *In re Baker & Getty Financial Services, Inc.,* 88 B.R. 137 (Bankr.N.D.Ohio 1988).

## FACTS

BAKER & GETTY FINANCIAL SERVICES, INC. ("BGFS"), incorporated in August, 1985, was intended to operate as a financial brokerage firm. In December, 1985, BAKER & GETTY DIVERSIFIED, INC. ("BGD") was formed to develop real estate investment opportunities for customers of the brokerage firm. To attract business, investors were told that Phillip Cordek's uncle, who resided in New York, had access to large blocks of common stock available for sale at a discount. The investors were told that, if purchased by them, the stock would be immediately sold at a profit and they would receive a substantial return on their principal investment. In reliance on these representations, many individuals sought to take advantage of these alleged investment opportunities by paying various sums to Cordek. No stock was ever actually available or purchased, and investor funds were converted by Cordek for his own personal enrichment, either directly or through initial deposit in Baker & Getty accounts. BAKER & GETTY SECURITIES, INC. ("BGS") was incorporated on May 28, 1986, with the intention that it would replace both BGFS and BGD, in part because of the many problems encountered in licensing BGFS as a securities firm. It appears that BGS was intended to be a continuation of BGFS, with virtually the same shareholders, officers, and directors. It also appears that Cordek's misappropriation of investor funds continued until its discovery in November, 1986.

Shortly after its formation, BGS began to complete the steps necessary to become fully licensed as a securities dealer. One of the requirements in order to become a member of the NATIONAL ASSOCIATION OF SECURITIES DEALERS ("NASD") was the procurement of a fidelity bond. Accordingly, on September 17, 1986, BGS applied for an NSAD group fidelity bond underwritten by NUFIC with MARSH & McCLENNAN GROUP ASSOCIATES, INC. ("M & M") acting as general managing agent of the program. Along with the application form, BGS submitted a check in the amount of Three Thousand, Eight & 00/100 Dollars ($3,008.00) to M & M.[1] This remittance apparently was in-

1. Testimony indicated that the premium was overpaid as the result of a miscalculation by

tended as payment for a 13–month bond.[2] M & M subsequently issued a securities dealer blanket bond for the one-month period of October 1 to November 1, 1986.

On November 5, 1986, the full Board of Directors of BGS was informed of Mr. Cordek's wrongful and fraudulent conduct. On January 22, 1987, involuntary petitions were filed against BGS, BGD and BGFS, and an Order of Relief was entered against the three corporations on February 17, 1987. On May 14, 1987, M & M issued another securities dealer blanket bond to BGS for the period from November 1, 1986, through November 1, 1987. On June 24, 1987, the Trustee notified NUFIC that a claim would be made on the bond. On September 28, 1987, the Trustee submitted a Proof of Loss to NUFIC claiming a loss of Two Million, Four Hundred Seventeen Thousand, Sixty–Six & 76/100 Dollars ($2,417,066.76). On December 8, 1987, the Trustee filed the Complaint in this adversary action. A trial was commenced on July 26, 1988, and was concluded on July 28, 1988.

## ARGUMENT

Initially, the Court notes that the Trustee is correct when he contends that Ohio law requires an insurance policy to be liberally construed in favor of the insured.[3] *Essex House v. St. Paul Fire & Marine Ins. Co.*, 404 F.Supp. 978, 986 (S.D. Ohio 1975); *Buckeye Union Ins. Co. v. Price*, 39 Ohio St.2d 95, 99, 313 N.E.2d 844, 846 (1974). It is also worth noting that Ohio law places upon the insurer the burden of proving an affirmative defense to an action upon an insurance policy. *Continental Ins. Co. v. Lewis Marks Co., Inc.*, 64 Ohio St.2d 399, 401, 415 N.E.2d 315, 317 (1980). Affirmative defenses are those which are based upon an exception or exclusion to an insurance policy. *Id.*

BGS.

**2.** Because all group participants in the program had a common annual renewal date of November 1, BGS initially could purchase coverage only until that date. Due to the nearness of the renewal date, however, BGS apparently included its one-year annual renewal payment with its initial one-month pro-rated payment.

Counsel for NUFIC has isolated its defenses to the Trustee's Complaint into six (6) issues. The Court will deal with these issues seriatim.

## I. STATUS OF MR. CORDEK AT BGS

■ NUFIC contends that Mr. Philip Cordek was not an "employee," as that term is defined in the fidelity bond, for whose dishonesty NUFIC would be responsible. The fidelity bond provides, in relevant part:

(a) Employee means:

(1) an officer or other employee of the Insured, while employed in, at or by any of the Insured's offices or premises covered hereunder. . . .

While the Court is inclined to agree with NUFIC that the evidence is inconclusive regarding Mr. Cordek's status as an officer, the evidence strongly supports our finding CORDEK to be an employee of BGS.

■ NUFIC correctly cites *Third Federal Savings & Loan Association v. Firemen's Fund Insurance Co.*, 548 F.2d 166 (6th Cir.1977) for the proposition that the "right to control is the hallmark of an employer-employee relationship" *Id.* at 171. In the present case, testimony indicated that Mr. Cordek was supposed to be both soliciting the interest of investors in BGS and studying for appropriate licensing examinations. NUFIC emphasizes the lack of any regular compensation arrangement or employment contract between Cordek and BGS. But, as the Sixth Circuit indicated in *Third Federal Savings*, such evidence is not dispositive. *Id.* at 169. Cordek appears to have generally reported to Mr. Steven Medved and "should have reported to Dan Schwenker and Greg DeSilvio," according to Mr. Medved. Mr. Cor-

**3.** It appears that bonds are subject to the same rules of construction as are applicable to insurance policies. *Suver v. Personal Serv. Ins. Co.*, 11 Ohio St.3d 6, 462 N.E.2d 415 (1984); *Main Supply, Inc., v. United Bonding Ins. Co.*, 24 Ohio St.2d 7, 263 N.E.2d 314 (1970) (*per curiam*).

dek considered himself an employee of BGS, received health care benefits from BGS and worked out of the BGS office or called the office on a daily basis. After moving to Cleveland, Cordek reportedly worked out of his home but continued to call the Youngstown office from five to ten times a day. The absence of actual control of Mr. Cordek by BGS, through its officers or Board of Directors, is irrelevant if the evidence demonstrates the existence of a *right* to control. The Court finds that BGS had a right to control Cordek. Thus, we conclude Mr. Cordek was an employee of the insured.

■ Furthermore, even if Cordek was not deemed to be an actual employee, we are persuaded that apparent agency or agency by estoppel would operate to establish Cordek as an agent/employee of BGS. The Trustee cites two cases for this proposition—*Posin v. A.B.C. Motor Court Hotel,* 45 Ohio St.2d 271, 344 N.E.2d 334 (1976) and *Ammerman v. Avis Rent A Car System, Inc.,* 7 Ohio App.3d 338, 455 N.E.2d 1041 (1982). NUFIC argues that agency by estoppel is inapplicable and attempts to distinguish the cases cited by the Trustee on the grounds that an actual employment relationship existed between the principal and the agent in those cases. However, the Court notes that Ohio law allows the use of agency by estoppel to establish a master/servant relationship both in the absence of an actual employment relationship and in order to determine whether such a relationship exists at all. *Councell v. Douglas,* 163 Ohio St. 292, 299, 126 N.E.2d 597, 601 (1955); *Murray v. Hills Cab Co.,* 119 Ohio App. 211, 215, 198 N.E.2d 466, 469 (1963); *Luken v. Buckeye Parking Corp.,* 77 Ohio App. 451, 68 N.E.2d 217 (1945). The relevant inquiry is whether the employer took any actions from which a third party could reasonably conclude that Cordek was an employee of BGS. *Blackwell v. UAW,* 9 Ohio App.3d 179, 181, 458 N.E. 2d 1272, 1275 (1983). In this regard, testimony indicated that Cordek maintained an office at BGS with his name on the door.

Cordek had access to and distributed a private placement memorandum for BGS. It also appears that investors who contacted BGS occasionally spoke to Cordek, and on those occasions when investors spoke to other employees of BGS, no one suggested that Cordek was not an employee. Investors viewed Cordek as an authorized representative of BGS and relied to their detriment on the appearance of a master and servant relationship between the two.[4]

NUFIC also contends that the doctrine of agency by estoppel is inapplicable in this case because the fidelity bond alone conclusively defines who is an employee for purposes of coverage. NUFIC is correct when it asserts that its liability must be based upon the bond, and due deference should be accorded to the definitions contained thereunder. But, the definition under which liability is asserted in this case must be construed. The bond's definition is ambiguous when it essentially defines an employee as "an employee employed by the insured." That definition is only meaningful when the term "employee" can be construed by reference to the appropriate legal tests—right of control and apparent authority. Accordingly, NUFIC's first defense is not well-taken.

## II. LOSS SUSTAINED BY BGS

■ The fidelity bond provides, in relevant part,

The Underwriter ... agrees with the Insured ... to indemnify and hold harmless the Insured for:

.　　.　　.　　.　　.

(A) Loss resulting directly from one or more dishonest or fraudulent acts of an Employee, committed anywhere and whether committed alone or in collusion with others, including loss of Property resulting from such acts of an Employee, which Property is held by the Insured for any purpose or in any capacity and whether so held gra-

---

**4.** NUFIC also maintains that an investor's belief alone does not transform Cordek into an employee. While that may be true, such a belief may be relevant in determining whether the law will deem Cordek to be an employee by estoppel as outlined above.

tuitously or not and whether or not the insured is liable therefor.

NUFIC maintains that losses were sustained by investors who disbursed funds to Cordek and not by BGS. It is undoubtedly true that investors, in the first instance, sustained a loss from Cordek's conduct. However, in the Court's view, this same conduct contemporaneously caused BGS to sustain a loss. We follow NUFIC's lead in analyzing this issue under two different lines of reasoning.

### A. *Respondeat Superior* Liability

It is axiomatic under the doctrine of *respondeat superior* that a principal is liable for the act of his agent if the act was performed within the apparent scope of the agent's employment. In *Posin v. A.B.C. Motor Court Hotel,* 45 Ohio St.2d 271, 344 N.E.2d 334 (1976), the Ohio Supreme Court described what the scope of employment entailed. The Court wrote:

> It is recognized, however, that not every deviation from the strict course of duty is a departure such as will relieve a master of liability for the acts of a servant....
>
> To sever the servant from the scope of his employment, the act complained of must be such a divergence from his regular duties that its very character severs the relationship of master and servant.

*Id.* at 278, 344 N.E.2d at 340. Because Cordek had been authorized to solicit interest in BGS from potential investors, the Court finds his solicitation of funds from investors was not "such a divergence" as to insulate BGS from liability for his actions. Moreover, even if Cordek's solicitation of funds was found to be outside the scope of his employment, BGS would still be liable under the doctrine of apparent authority, as outlined earlier.

NUFIC also contends that BGS never had custody of the funds insofar as investor funds were deposited only into bank accounts for Cordek, BGFS or BGD. We view this argument as urging the Court to elevate form over substance. The evidence shows that BGS was intended to be and was simply a reconstituted BGFS. The employees, principals and business transac-

tions of the two companies were virtually identical. BGD never conducted any business and only existed as a name on a bank account. It appears that funds were both freely and frequently transferred between BGFS and BGD. Moreover, most investors' checks were made out to "Baker & Getty," without denominating whether it was to be "Financial Services", "Diversified", or "Securities". Most investors were not aware that there was more than one Baker & Getty entity, and the evidence strongly suggests that no effort was made to create such an awareness. Based upon the evidence as a whole, the Court finds that all three companies constituted a single corporate operation, and the corporate identity between the three Debtors ought to be disregarded for purposes of this proceeding in order to prevent inequitable consequences and more nearly match the result to the reality of the surrounding circumstances. *Bucyrus Erie Co. v. General Prods. Corp.,* 643 F.2d 413, 419 (6th Cir. 1981); *Holywell Corp. v. Bank of N.Y.,* 59 B.R. 340 (S.D.Fla.1986). Accordingly, the Court will deem BGS to have had actual or constructive possession of any funds held by any of the corporate Debtors after the formation of BGS on May 28, 1986.

### B. Type of Loss for which NUFIC is Liable

NUFIC also argues that the bond does not provide for losses sustained by the creation of liability to third persons. It appears to the Court, however, that when Cordek, as an agent of BGS, obtained funds in the Company's name but neglected to remit such funds to the Company, BGS nevertheless incurred an obligation to repay those funds. This view is supported by the authoritative treatise cited by the Trustee which the Court finds to be persuasive regarding the status of fidelity bond coverage. That treatise provides that:

> The loss covered by an employee's fidelity bond is not necessarily limited to loss directly resulting from the employee's act, such as embezzlement. To the contrary, it may include liability on the part

of the insured resulting from the application of the principles of vicarious liability. In other words, a bond insuring against loss sustained by reason of dishonesty, fraud, embezzlement, etc., covers losses imposed by the creation of liability to third persons. To illustrate, it has been held that a loss may be suffered by the Insured through being required to make good an obligation to a third person created by the fraud of its employee perpretrated on such third person.

13 *Couch on Insurance 2d,* Sec. 46:101 (2d Ed.1982) (footnotes omitted). The cases cited by NUFIC do not suggest a contrary conclusion. The Court concurs with the authorities to the extent they indicate that a loss by the insured is necessary in order to recover under a fidelity bond. However, as emphasized above, the Court finds BGS to have suffered a loss. Furthermore, however, the cases are distinguishable on the facts to the extent NUFIC relies on them to support its argument that losses imposed upon the insured for the benefit of third parties are not recoverable under a fidelity bond. In any event, this Court believes the better view is expressed in *Insurance Company of North America v. Gibralco, Inc.,* 847 F.2d 530 (9th Cir.1988). NUFIC attempted to distinguish *Gibralco* on the basis that it involved whether the "trading exclusion" should preclude recovery. However, within its discussion, the court indicated its view that wrongful losses to customers by a principal's agent are chargeable to the principal, thereby constituting a loss to the principal. The court wrote:

The actual losses [to the brokerage firm] occurred ... when Grayson [the firm's employee] wrongfully retained the sales proceeds of the customer's bonds or when the rightful owners claimed their bonds, and when Grayson stole the Rancho, California bearer bonds. Indeed, Gibralco would have suffered losses as a result of Grayson's activities, whether or not the stolen bonds or proceeds were ultimately traded.

*Id.* at 533. The Court is satisfied that BGS sustained a loss through Cordek's wrongful conduct.

■ NUFIC also contends that Cordek's wrongful conduct does not constitute "dishonest and fraudulent acts" as defined in the fidelity bond. The bond states:

Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with a manifest intent:

1. to cause the Insured to sustain such Loss, and

2. to obtain financial benefit for the Employee, or for any other person or organization intended by the Employee to receive such benefits....

While NUFIC admits that Cordek intended to obtain a financial benefit for himself at the expense of investors, it disputes whether Cordek intended BGS to sustain a loss. In order to resolve this argument, we first must determine what type of intent is required. We begin with the definition of "intent":

The word 'intent' for purposes of exclusionary clauses in insurance policies denotes that the actor desires to cause the consequences of his act or believes that the consequences are substantially certain to result from it.

*Aetna Casualty & Surety Co. v. Freyer,* 89 Ill.App.3d 617, 44 Ill.Dec. 791, 411 N.E.2d 1157 (1980) (citing 7A *Insurance Law and Practice,* Sec. 4492.02 (Berdal ed.)); *see also Hanover Ins. Group v. Cameron,* 122 N.J. Super 51, 298 A.2d 715 (Ch.Div.1973). According to the language of the bond, intent is also supposed to be "manifest," which is defined as "[e]vident to the senses ..., obvious to the understanding." *Black's Law Dictionary,* 867 (5th ed. 1979). Thus, the question is whether Cordek obviously knew to a substantial certainty that BGS would sustain a loss by his conduct. Mr. Cordek instructed investors to make their checks payable to either "Baker & Getty" or "Baker & Getty Securities." Many investors' transactions were memorialized in Baker & Getty confirmation forms. Cordek caused several investors to receive a draft of a private place-

ment memorandum for BGS in order to induce them to invest. Cordek led the investors to believe that they were dealing with, and he was dealing for, a corporate enterprise named "Baker & Getty." The law deems that individuals are presumed to intend the natural consequences of their actions. *McLane v. Stillmaker*, 103 Ohio App. 255, 143 N.E.2d 610 (1957). The Court believes it strains credulity to believe that Cordek did not know that BGS would be responsible to compensate investors whose funds he converted. We believe that Cordek intended both investors and BGS to sustain a loss when he wrongfully converted investors' funds.

When Cordek obtained funds from investors, BGS incurred an obligation to repay the funds. In addition, the funds were constructively held by BGS, notwithstanding the fact that they were deposited into the accounts of BGFS and BGD. Cordek's failure to remit the funds and conversion of the same constituted acts on the part of Cordek which caused a loss to BGS for which NUFIC is liable under the bond. *See Duel v. Nat'l. Surety Corp.*, 64 F.Supp. 961, 966 (E.D.Wis.1945), *aff'd. per curiam*, 157 F.2d 516 (7th Cir.1946).

## III. FRAUDULENT CONCEALMENT AND EQUITABLE CONSIDERATIONS

■ NUFIC alleges that the Directors of BGS had knowledge about the misappropriation of investor funds by Cordek. Based upon this alleged knowledge, NUFIC argues that recovery ought to be precluded because (1) nondisclosure of this knowledge to NUFIC constituted fraudulent concealment; and (2) equity should not sanction directors' actions in the face of knowledge of an employee's dishonest acts.

NUFIC repeatedly suggests the absurdity of Cordek's story of an uncle in New York who could assist in the purchase of block buys of stock. The inference is that directors either knew or should have known that Cordek's representations were false based on Cordek's preposterous story. The Court submits that the story must have had a great deal of believability when one considers the number of people deluded by it. Mr. Mandel even testified that Cordek had memorabilia in his office which supported his story. In addition, the record clearly indicates that Directors at the November 5, 1986, meeting exhibited surprise, disbelief and anger when Cordek's wrongful conduct was revealed.

### A. Bella

NUFIC essentially argues that Mr. Bella, as a CPA handling the internal accounting, either knew or should have known of the misappropriation of funds. However, Mr. Bella testified that he first suspected wrongdoing in November, 1986. He also testified that he believed Cordek had secured loans for the Company from a Mr. Velgott. He also testified that he was never able to get an accurate financial picture of the related companies because of a continual lack of information, specifically from Mr. Cordek. In fact, this appears to have helped precipitate the participation of Mr. Bassett as an outside accountant. It was presumed that Mr. Bassett, being from Cleveland, could more easily reach Cordek after Cordek had begun working out of his home near Cleveland. Mr. Bella's testimony was straightforward and uncontradicted and, thus, the Court credits his testimony. Accordingly, the Court finds no evidence to suggest that Mr. Bella either knew or concealed information regarding Cordek's conduct.

### B. Mandel

NUFIC contends that Mr. Mandel, as the attorney for the Corporation, was aware that investor funds were being improperly used. However, Mr. Mandel testified that he first learned of Cordek's thievery approximately three to five days before the November 5, 1986 meeting. The Court finds Mr. Mandel's testimony to be credible. Thus, there is insufficient evidence to suggest that Mr. Mandel either knew or concealed information regarding Cordek's conduct.

### C. Frissora

Mr. Frissora never was called to testify in this proceeding. Despite this fact, NUF-

IC attempts to draw conclusions about his behavior without even introducing his deposition into evidence. Cordek testified that he never told Frissora or others that securities weren't being purchased. The Court finds itself unable to conclude that Mr. Frissora was culpable based on the testimony and documents before us.

### D. Medved

Mr. Medved also testified that he first became aware of Cordek's failure to buy stock in October, 1986—shortly before the whole Ponzi Scheme was discovered. Medved indicated that Cordek led him to believe that Barry Goodman was a cousin of Cordek who worked in a New York brokerage house.

NUFIC argues that Medved had to know that investor monies were being solicited and converted because of the infusions of fresh money that funded the Baker & Getty accounts. While it appears that Medved was generally aware of deposits and wire transfers into the Youngstown bank accounts, he testified that Cordek had indicated that his uncle had loaned him money two to three times over the course of the Baker & Getty episode. This would appear to be consistent with what Cordek apparently told others at Baker & Getty.

NUFIC also asserts that Medved knew of the activity occurring in the Manufacturers Hanover ("MH") account in New York. It seems safe to assume that Medved's request for monthly statements of that account in April, 1986, demonstrate his lack of knowledge concerning the account. In addition, we do not view Medved's contention that he never received the information as patently absurd, as NUFIC suggests. It appears that Medved was frequently traveling for extended periods of time to ostensibly evaluate possible real estate investment opportunities. It is not unreasonable to assume that the information Medved requested on the MH account was forwarded to Cordek in Medved's absence. NUFIC's suggestion that Medved bribed Mr. Tuttle from MH Bank is not supported by the evidence. First of all, it is unclear how Mr. Tuttle would contribute to the perpetration of the fraud. Moreover, it appears that a payment made to Mr. Tuttle was solely in connection with negotiations surrounding his possible employment by Baker & Getty.

NUFIC also asserts that Medved knew that confirmation slips were being mailed to investors. Even if he did know this fact, it does not demonstrate his knowledge concerning the falsity of the information contained therein. In fact, Medved testified that Cordek led him to believe that the confirmation slips were being used for accounting procedures for Cordek's uncle. Medved clearly had no securities background or experience which would have put him on notice or inquiry regarding Cordek's actions in this respect.

The Court is persuaded that Mr. Medved's testimony is not to be fully credited as trustworthy. Nevertheless, NUFIC's argument is rejected. Practically all of the inculpatory information concerning Mr. Medved, upon which NUFIC relies, was provided by Mr. Cordek's testimony and was not otherwise supported in the record. The Court also finds itself unable to fully credit Mr. Cordek's testimony. On balance, we find that NUFIC has not sustained its burden regarding the culpability of Mr. Medved.

### E. Schwenker

Like Frissora, the Court believes there is insufficient evidence in the record to conclude that he knew of or had reason to suspect Cordek's misappropriation of investor funds.

Thus, the Court concludes that the Directors had no knowledge of the fraud which was perpetrated by Cordek sufficient to constitute fraudulent concealment. Accordingly, NUFIC's defenses of fraudulent concealment and equitable considerations are dismissed as unsupported.

### IV. TIMELINESS OF NOTICE AND PROOF OF LOSS

■ NUFIC argues that the insured and the Trustee failed to comply with the requirement of prompt notice and full proof of loss within six (6) months of discovery of

the loss. The relevant part of the fidelity bond provides:

> Section 4. ... (A)t the earliest practicable moment after discovery of any loss hereunder, the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars.... Discovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not be then known.

It appears to the Court that BGS must be charged with discovery of the loss on November 5, 1986. Mr. Schwenker and Mr. DeSilvio either knew or should have known of the potential for coverage under the bond insofar as the application designated Mr. DeSilvio as the contact person and Mr. Schwenker signed the application as President of the Company. However, as managing agent for NUFIC, M & M's failure to give timely notice of coverage to BGS excuses the lack of prompt notice of the loss.

Furthermore, the required submission of a proof of loss within six (6) months of discovery of the loss must also be excused. Testimony indicates that Mr. DeSilvio left BGS on November 7, 1986; and, if the Court is to accept NUFIC's representation, Mr. Schwenker left a few weeks later. Thus, by December, 1986, it appears that there were no employees of BGS to calculate a proof of loss. In any event, when the Trustee succeeded to administration of the consolidated estates, he had no reason to know that fidelity bond coverage had been obtained. The evidence before us supports the conclusion that no policy was sent to or received by any Debtor entity for the November 1, 1986–November 1, 1987 period until after the Trustee was appointed. Thus, the Court believes that the six-month bar period must be tolled as of December, 1986, until the Trustee received notice of coverage on or about May 14,

1987. Since a proof of loss was submitted about four (4) months thereafter, we find that submission of the proof of loss was timely.

■ Moreover, this Court's review of Ohio law suggests that where a policy merely provides that proofs of loss must be made within a specified time, without providing that failure shall render the policy void, or that suit cannot be brought if proofs are not so made, compliance within the time limitation is not a condition precedent; rather, the only penalty is that suit cannot be brought until proofs have been made, and this the insured may do after the specified period has expired. *See Central Trust & Safe Deposit Co. v. Dubuque Fire & Marine Ins. Co.*, 1 Ohio App. 447 (1913), *aff'd* 92 Ohio St. 516, 112 N.E. 1083 (1915); *Wood v. Connecticut Fire Ins. Co.*, 17 Ohio N.P. (n.s.) 273 (1913).

■ Finally, we are persuaded that Ohio law now requires the insurer to show prejudice from late notice in order to be relieved of liability. *Patrick v. Auto–Owners Ins. Co.*, 5 Ohio App.3d 118, 449 N.E.2d 790 (1982). NUFIC's defense of untimely notice and proof of loss is not supported by the evidence or applicable law.

## V. AMOUNT OF LOSS

■ NUFIC's final argument is that, if it is liable at all, it is only liable for Five Hundred Thousand & 00/100 Dollars ($500,000.00), pursuant to the terms of the bond.[5] Aggregate liability under the bond is limited to One Million & 00/100 Dollars ($1,000,000.000) with a single-loss limit of Five Hundred Thousand & 00/100 Dollars ($500,000.00). "Single loss" is defined as follows:

> Single Loss means all loss, including court costs and attorney's fees incurred by the Underwriter under General Agreement C resulting from
>
> (a) any one act or series of related acts of burglary, robbery or attempt there-

---

**5.** Although this argument was not raised by the Defendant in either its Amended Answer or in its Pre-trial and Post–Trial Briefs, the issue was advanced in the Defendant's Reply Brief. This appears to have been proper since Plaintiff initially raised the issue in its Post–Trial Brief.

at, in which no Employee is implicated, or

(b) any one act or series of related unintentional or negligent acts or omissions on the part of any person (whether an Employee or not) resulting in damage to or destruction or misplacement of capital property, or

(c) all acts or omissions other than those specified in (a) and (b) preceding, caused by any person (whether an Employee or not) or in which such person is implicated, or

(d) any one casualty or event not specified in (a), (b) or (c) preceding.

NUFIC appears to be correct when it cites subsection (c) as the applicable definition in this proceeding. Therefore, "Single Loss" means "all loss ... resulting from all acts or omissions ... caused by any person (whether an Employee or not) or in which such person is implicated."

The Trustee suggests that the words "all acts or omissions" should be construed to mean all acts or omissions relating to each investor. But, such a construction would constitute an unreasonable interpretation in light of the "all loss" language of the bond. As NUFIC emphasizes, the bond language focuses on the acts of the wrongdoer. Consequently, all acts of Cordek in connection with investors for which BGS is liable constitute a Single Loss according to the bond language. This result appears to be consistent with conclusions reached in similar cases.[6] *Business Interiors, Inc. v. Aetna Casualty & Sur. Co.*, 751 F.2d 361, 363 (10th Cir.1984); *Howard, Wheil, Labouisse, Friedrichs, Inc. v. Insurance Co. of North America*, 557 F.2d 1055, 1059–60 (5th Cir.1977); *Benton State Bank v. Hartford Accident & Indem. Co.*, 452 F.2d 5, 7 (8th Cir.1971).

Accordingly, NUFIC's liability to the Trustee is determined to be Five Hundred Thousand & 00/100 Dollars ($500,000.00).

The Trustee is not entitled to additional amounts for court costs and attorney's fees since such amounts are included within the Single Loss limitation. The Trustee appears to be entitled to prejudgment interest. Pursuant to Ohio Rev. Code Ann. Sec. 1343.03 (Anderson 1979 & Supp.1987), prejudgment interest shall be awarded to the Trustee at the rate of ten (10%) per annum from December 8, 1987, the date on which the Complaint in this proceeding was filed.[7]

This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

---

6. *But see North River Ins. Co. v. Huff,* 628 F.Supp. 1129 (D. Kansas 1985). However, the rationale advanced by the Court in that case to find separate losses is not applicable in this proceeding.

7. It appears that "an insurance company can be held liable for prejudgment interest pursuant to Ohio Rev. Code 1343.03 in excess of any stated limits in its policy." *Phoenix Phase I Assoc. v. Ginsberg, Guren & Merritt,* 23 Ohio App.3d 1, 5, 490 N.E.2d 634 (1985).