**PEOPLES BANK & TRUST COMPANY OF MADISON COUNTY, Plaintiff–Appellant,**

v.

**The AETNA CASUALTY & SURETY COMPANY and the Ohio Casualty Insurance Company, Defendants–Appellees.**

No. 95–6250.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 3, 1997.

Decided May 19, 1997.

suspicious given the Union's custom of having some Union members strike the Company while others continued to work.

William M. Lear, Jr., J. Mel Camenisch, Jr., William L. Montague (briefed), Stoll, Keenon & Park, Lexington, KY, James T. Gilbert (argued), Coy, Gilbert & Gilbert, Richmond, KY, for Peoples Bank & Trust Company of Madison County.

Steven C. Martin (argued and briefed), McCaslin, Imbus & McCaslin, Cincinnati, OH, for The Aetna Casualty & Surety Company.

George B. Hocker (argued and briefed), Clark, Ward & Cave, Lexington, KY, for the Ohio Casualty Insurance Company.

Before: KRUPANSKY, BOGGS, and SILER, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

Several officers and directors of Peoples Bank & Trust Co. of Madison County ("Peoples") cheated two bank customers in a business transaction. The customers sued the bank and its employees for fraud, and ultimately obtained a large settlement. Peoples

then sued to recover that loss from its insurers, Aetna Casualty & Surety Company and Ohio Casualty Insurance Co. ("OCIC"), issuers of Bankers Blanket Bonds held by Peoples.[1] Peoples appeals the district court's order of summary judgment for defendants. Because we agree with the district court that the officers and directors did not show the requisite "manifest intent" to cause a loss to Peoples, we affirm.

## I

We begin the tale *in medias res*, in 1985, when Lawrence C. and Shirley A. Noble filed suit against Peoples and four of its officers and directors in Madison County, Kentucky, Circuit Court, alleging fraud and breach of fiduciary duty. The Nobles sought unspecified compensatory damages based, in part, on the loss of expectations, damage to reputation and credit, and severe emotional distress. They also sought punitive damages based on their allegation that "the actions of Defendants ... were deliberate, intentional, wanton, oppressive, and in reckless disregard of [the Nobles'] rights."

The Nobles' grievance against Peoples dated to 1979. At that time, they operated a filling station in Madison County, Kentucky, but aspired to some new business. They confided their ambitions to their banker, Robert E. Harris, executive vice president of Peoples. At one point, they considered adding a "Convenient store" to their service station, at a cost of about $15,000. Harris discouraged them from that modest and straightforward investment.

At about the same time the Nobles were expressing to Harris their eagerness to get into a new business, two of Harris's colleagues on the board of directors of Peoples told him of their desire to rid themselves of a business, and offered Harris a finder's fee for rounding up a buyer.

The enterprise in question was the Iron Gate Restaurant and Lounge, in Richmond, Kentucky, not far up the road from Berea, Kentucky, home of Peoples. The co-directors, Hershel Jones and Roger M. Oliver, Esq. (who was also the bank's counsel), each owned a one-third interest in the restaurant.

Harris urged the Nobles to buy the Iron Gate (according to the allegations in their lawsuit), saying the restaurant was doing "fantastic" and would be an ideal investment for the pair. The asking price was $210,000, he said, but the restaurant could be had for just $185,000.

To these temptations the Nobles succumbed. They did not have $185,000, but asked Peoples to loan them the sum. Harris presented the request to his boss, Marion Dempsey, the president and C.E.O. of Peoples, and agreed to split the finder's fee with Dempsey if the deal closed. The reason for splitting the commission with Dempsey is not stated; perhaps it was to secure his collusion in making the loan without submitting it to the bank's loan committee. Whatever the personal inducements, Dempsey and Harris decided that the credit risk on such a loan was too great for Peoples, and that the bank could make the loan only if the Small Business Administration were willing to guarantee ninety percent of it.

Harris and Oliver then prepared an SBA loan guarantee application for the Nobles and their newly-formed company, Noble Enterprises, Inc. Oliver, though himself a seller, also acted as Peoples's counsel, and rendered opinions in connection with the application.

---

**1.** The Bankers Blanket Bonds in this case are the then-current versions of the Surety Association of America's Standard Form 24. They contain six "Insuring Agreements" covering six general types of risk. One of these is for losses caused by dishonest or fraudulent acts of employees. That portion of the blanket bond is referred to as a fidelity bond. Standard Form 24, after reciting the Insuring Agreements, sets forth General Agreements and Conditions and Limitations pertaining to all the Insuring Agreements. The Conditions and Limitations section contains the provisions on discovery of loss and subrogation that are relevant in this case.

The OCIC and Aetna policies contain the narrowing language added by the Surety Association to its Standard Form in 1980, including the "manifest intent" phrase central to this case. *See* Michael Keeley, *Employee Dishonesty Claims: Discerning the Employee's Manifest Intent,* 30 TORT & INS. L.J. 915, 916 (1991). In 1986, the Surety Association renamed the policies "Financial Institution Bonds" in order to remove the implication of "blanket" coverage. *Ibid.*

As an essential step in obtaining the guarantee, Harris executed an SBA Settlement Sheet on behalf of Peoples certifying that "neither the Lender nor its officers, agents, affiliates or attorneys, have or will charge or receive, directly or indirectly, any bonus, fee, commission, or other payment or benefit.... Lender and Borrower hereby certify that no [such] fees have been or will be paid, directly or indirectly.... It is understood that all fees not approved by SBA are prohibited." Harris was not deterred by the legend on the Settlement Sheet clearly citing the statutory prohibitions against making false statements for the purpose of influencing in any way the action of the SBA, and warning of the possible penalties for so doing: a fine of not more than $5,000, or imprisonment for not more than two years, or both. *See* 18 U.S.C. § 1001 and 15 U.S.C. § 645. The concealment carried out by Harris also led to the frustration of SBA regulations against agency participation in a loan to finance the purchase of property in which the lender or an "associated person"—including the lender's officers and directors—is the seller, unless the SBA first makes a written determination that the purchase from the lender or associate is in the best interests of the small business concern. 13 C.F.R. §§ 120.1, 120.5(a)(1).

The fraudulently prepared and certified application passed muster at the SBA, which issued the desired guarantee. In August 1979, the Iron Gate sale closed. Jones and Oliver each pocketed some $60,000 for their shares of the business. Harris and Dempsey split a $5,800 finder's fee. The Nobles were in business.

But not for long. Within a year, their complaint averred, the Nobles "discovered that they had been induced by the aforesaid representations to purchase Iron Gate Restaurant at an extremely inflated price and that the restaurant was of little value and was not then and never had been a profitable business." By then, they had already stopped making payments on the Peoples loan. They filed for bankruptcy in 1981 and were discharged of their debts.

Shortly after completing the loan, Peoples had sold the guaranteed ninety-percent portion in the secondary market. When the Nobles defaulted, the then-assignee made demand on the SBA under the guarantee. The SBA honored the guarantee, to the tune of $171,604 in principal and interest.

There matters rested until April 1982, when the SBA, having received allegations from sources not revealed in the record, notified Peoples that it suspected "irregularities" in the application. After further investigation confirmed the false statements on the guarantee forms, the SBA demanded reimbursement by Peoples.

The chairman of the board of Peoples— who was, by all indications, unconnected with the transaction—retained counsel to investigate, confirmed the malfeasance of Dempsey, Harris, and Oliver, fired them, and notified appropriate banking regulators and the United States Attorney.

The bank also promptly notified its then-insurer, OCIC, of the discovery of what it believed was an insurable loss under the Bankers Blanket Bond issued by OCIC on January 1, 1981.[2] Peoples submitted to OCIC a Proof of Loss under the fidelity bond, providing a detailed description of the dishonest and fraudulent acts of its employees and directors, and claiming a total of $200,607.[3] In February 1983, OCIC and Peoples negotiated a compromise settlement whereby OCIC paid Peoples $50,000, and Peoples released and discharged OCIC from "any and all claims, demands, actions or causes of actions, accrued, or to accrue, by reason of, or in any manner growing out of" the defaults of Dempsey, Harris, and Oliver.

Peoples replaced the OCIC Bankers Blanket Bond with one issued by Aetna, effective May 1, 1984. The Aetna bond had a higher

---

2. Although the dishonest acts leading to the loss occurred prior to the effective date of the policy, the bond applied by its terms to losses *discovered* by the insured during the coverage period.

3. This consisted of $171,604 for the claim of the SBA; $22,129 for the bank's loss on the Noble loan; and $9,374 in attorney's fees and expenses for a total loss of $203,107. The policy had a $2,500 deductible, leading to the total claim of $200,607.

liability limit and deductible than the OCIC bond, but was an otherwise identical Standard Form 24 policy.

## II

For four years, meanwhile, the Nobles, even as they benefitted from the "fresh start" granted by the Bankruptcy Code, continued to nurture their grievance. Thus, we come around to where we began, with the filing of their lawsuit against Peoples in May 1985.

Upon receiving the Nobles' summons and complaint, Peoples promptly notified OCIC by letter, stated its position that the OCIC Bankers Blanket Bond covered the event, and invited OCIC to exercise its right under the bond to conduct the defense. OCIC responded by asserting its belief that "the release taken in February 24, 1983 is solid and discharges us from any further claims on this particular action." Further, OCIC asserted that the discovery of any loss that might flow from the lawsuit occurred at the time of the filing of the suit, after the coverage period of the OCIC bond ended.

Similarly, Peoples promptly notified Aetna of the Noble lawsuit, stated that it believed the Aetna bond covered any loss that might result, and invited Aetna to exercise its right under the bond to defend against the action. Aetna denied coverage on the grounds that discovery of the potential claim by a third party occurred when the SBA notified Peoples of the irregularities it had found in 1982, a date outside the period of coverage.

The record tells us little of the eight-year state court saga of Noble v. Peoples Bank & Trust Co. For present purposes, it is only important to know that Peoples's insurers declined to participate in the defense, and that in late 1993, on the eve of trial, Peoples settled the suit for $350,000.

Peoples promptly presented Proofs of Loss to both OCIC and Aetna, claiming the amount of settlement plus litigation costs. OCIC reiterated its previous denial of cover-

age; Aetna ignored the claim. Peoples thus filed the present action in district court pursuant to 28 U.S.C. §§ 2201 and 2202, seeking a declaration of rights among the parties and a determination that either OCIC or Aetna was obligated to cover the loss under the respective policies. The case was referred to a magistrate judge to hear and determine pre-trial matters and to submit proposed findings of fact and recommendations on all dispositive motions. All parties filed motions for summary judgment. The magistrate judge recommended that the motions of Aetna and OCIC be denied, and that the motion by Peoples be denied, except to the extent that it would preclude Aetna and OCIC from relitigating the merits of the settled Noble litigation.

All parties filed objections to the magistrate judge's report and recommendations. In view of the objections, the district court reviewed the case de novo. Rejecting the recommendation of the magistrate judge, the district court granted the motions by Aetna and OCIC for summary judgment. Peoples filed a motion to alter and amend, but the court reiterated its earlier decision in an order accompanied by another memorandum opinion.[4] Peoples timely appealed to this court.

## III

We review the district court's order of summary judgment de novo, applying the same standards as the district court under Rule 56(c), FED.R.CIV.P. *Montgomery v. Carr*, 101 F.3d 1117, 1120 (6th Cir.1996).

■ The Standard Form 24 policies issued by OCIC and Aetna provided for indemnification of a variety of losses, including "[l]oss resulting directly from dishonest or fraudulent acts of an Employee committed alone or in collusion with others." The policies further provided that:

> Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only

---

4. In the course of addressing several cases urged by Peoples, the court, in the second opinion, reiterated its conclusion that "there is no evidence of record to remotely suggest that in orchestrating the loan to the Nobles, Peoples Bank's

employees had the 'manifest intent' to defraud the bank." The court went on to observe that "[i]n fact, the bank's employees took affirmative steps to protect the bank by obtaining the SBA's guarantee of 90% of this loan."

dishonest or fraudulent acts committed by such Employee with the manifest intent

(a) to cause the insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or for any other person or organization ... other than [financial benefits] earned in the normal course of employment.

The district court properly concentrated its attention on the issue of whether the dishonest acts of the Peoples officers and directors were done with "manifest intent" to cause the bank to sustain a loss. After reviewing the facts and examining the case law, including two leading Sixth Circuit cases, the district court concluded that, while it was "clear that the officers and directors at Peoples involved in the loan to the Nobles breached their fiduciary duty to the bank by failing to disclose their conflicts of interest," it was "equally clear that in taking the steps necessary to process the Nobles' loan, the bank's officers and directors had no 'manifest intent' to cause a loss to Peoples Bank." [5] We agree with that conclusion.

We first note that the actions of Harris and his co-conspirators exposed Peoples to at least two kinds of potential losses: losses that might be incurred if the Nobles defaulted on the loan, and damages that might result from a lawsuit by the Nobles. In this lawsuit, Peoples seeks indemnification only for the latter, so we need not consider whether the wrongdoers possessed manifest intent to cause Peoples a loss on the loan itself.

In its brief, Peoples asserts that "the district court held that a bank employee's fraudulent activities toward a third party cannot, as a matter of law, be equated with 'manifest intent' to harm the bank, as required by the bond." We do not discern a blanket holding to that effect in either of the district court's opinions, nor do we make such a categorical holding today. As a practical matter, however, losses resulting from frauds on third parties will rarely be covered by Standard Form 24. These policies will cover a loss suffered

by a third party only where the dishonest employees intended to cause the third-party loss, and knew or expected that the loss would migrate to the bank. The migratory route would need to be short, certain, and obvious to support an inference (in the absence of direct evidence) that dishonest employees harbored such knowledge or expectation.

Assuming for present purposes that Harris, Oliver, and Jones knew they were cheating the Nobles by misrepresenting the past and likely future value of the Iron Gate, too many contingencies intervened between that fraud and the eventual loss to the bank for us to conclude that the perpetrators held a "manifest intent" to cause the bank's loss. First, the malfeasors would have had to know or expect that the Nobles first would lose money and then would sue the bank. A decision by the Nobles to sue would turn in part on the Nobles' litigiousness as of 1979, about which there is no evidence in the record. Such a decision would also turn on the extent of the Nobles' sense of aggrievement, which would turn on how bad a failure the business turned out to be. We have no evidence to suggest that the cheaters knew the Iron Gate would fail utterly. It might yield a pitiful return, or even consistently operate in the red. But perhaps the Nobles would soldier on, always hoping, like Micawber, that things would improve, and meanwhile somehow meeting their obligations and eking out a living, as so many operators of marginal small businesses do. Of course, the Iron Gate did not have to go out of business before the Nobles suffered and could seek to recover damages for fraud, but we think it would have been less likely for them to try as long as the restaurant remained open. The malfeasors' lack of knowledge as to how acutely the Nobles would suffer as a result of the fraud, and how motivated to sue they would therefore be, is another level of contingency.

Assuming that the malfeasors somehow knew or expected that the Nobles would sue,

---

**5.** Having found that the facts did not satisfy the manifest intent requirement, the district court did not reach OCIC's defense that its 1982 settlement with Peoples released it from further obli-

gation, and both insurers' defense that the discovery of the loss did not fall within the coverage period of their respective policies.

they would also have had to know or expect that as plaintiffs the Nobles would have the spleen, spine, stomach, and lawyer to endure years of litigation, and that they ultimately would either convince the bank to settle, or convince a judge or jury to award them a judgment.[6] Even a meritorious lawsuit, as this one appears to have been, is dicey. It would not be possible to infer that the malfeasors knew the bank would lose such a suit; the bank itself did not concede the probability of losing it for eight years.

Given these layered uncertainties, we cannot say that the malfeasors intended to cause the bank a loss by way of an award of damages to the Nobles. As we observed in *FDIC v. St. Paul Fire & Marine Insurance Co.*, 942 F.2d 1032, 1035 (6th Cir.1991), "[a]lthough the concept of 'manifest intent' does not necessarily require that the employee actively wish for or desire a particular result, it does require more than a mere probability.... [M]anifest intent exists when a particular result is 'substantially certain' to follow from conduct.'" When Harris and his co-conspirators cheated the Nobles, there was no substantial certainty that a loss would flow to Peoples Bank.

## IV

Peoples cites a number of cases in which courts have held that the trier of fact can infer manifest intent to harm the bank where loss to the bank resulted from the employee's recklessness. *See, e.g., FDIC v. Oldenburg,* 34 F.3d 1529, 1539 (10th Cir.1994) (where evidence suggested that bank officer knowingly violated federal regulations, backdated minutes of board meeting crucial to loan decision, failed to disclose or materially misrepresented information pertinent to loan, and continued to deceive federal regulators, officer's "reckless conduct" supported district court's finding of his intent to cause bank's loss); *FDIC v. United Pacific Ins. Co.*, 20 F.3d 1070, 1078 (10th Cir.1994) ("evidence of reckless conduct can support an inference of manifest intent"); *Heller Int'l Corp. v.*

*Sharp,* 974 F.2d 850, 859 (7th Cir.1992) (refusal to give jury instruction on manifest intent was reversible error, in part because "when an employee obtains fraudulent loans with reckless disregard for a substantial risk of loss to the bank, a jury may infer from his reckless conduct and surrounding circumstances that he intended to cause that loss"); *First Nat'l Bank of Louisville v. Lustig,* 961 F.2d 1162, 1166 (5th Cir.1992). Other cases have found manifest intent on the theory that an individual can be presumed to intend the natural and probable consequences of his actions. *See, e.g., In re Baker & Getty Fin. Servs., Inc.*, 93 B.R. 559 (Bankr.N.D.Ohio 1988); *In re Lloyd Sec., Inc.*, 1992 WL 236162 (Bankr.E.D.Pa. Sept. 17, 1992); *National Bank of Pakistan v. Basham,* 142 A.D.2d 532, 531 N.Y.S.2d 250 (1988).

■ It is doubtful that Peoples could prevail even applying those precepts. As for the "natural and probable consequences" theory, while there was nothing unnatural about the Nobles bringing and favorably settling their lawsuit, because of the contingencies described above, we cannot say it was probable. Besides, the court was correct in holding that this court rejected the "natural and probable consequences" theory in *Municipal Securities, Inc. v. Insurance Co. of North America,* 829 F.2d 7 (6th Cir.1987), and in *St. Paul Fire & Marine,* 942 F.2d at 1035–36 ("Had we applied [in *Municipal Securities*] the [natural and probable consequences] standard suggested by the FDIC, we would certainly have found that Hargraves [the dishonest employee in *Municipal Securities*] had the manifest intent to defraud her employer. There is nothing more 'natural and probable' than that a young securities trader who gets over her head and exceeds her inventory limit will suffer large losses.").

■ In response to the insurers' assertion that we similarly rejected the "reckless conduct" theory in *St. Paul Fire & Marine,* Peoples correctly argues that our reference

---

6. The mere filing of such a lawsuit would cause Peoples some loss, since the bank would have been obliged to spend money in defending it. But we cannot conclude that the malfeasors intended the Nobles to file the suit. Indeed, we note that the Nobles did not file their complaint until over five years after the frauds they alleged. They might have decided to "just let it go"; they might have allowed the statute of limitations to elapse.

to recklessness there was simply a characterization of a high degree of bad business judgment used in making loans, 942 F.2d at 1036, and not a pronouncement on the significance of every kind of reckless behavior in cases of this kind. Like our sister circuits, we recognize that reckless conduct might be evidence—a manifestation—of intent. But recklessness itself, without an inference of intent, would clearly not satisfy the language of the policy, any more than recklessness alone would create culpability for a crime requiring specific intent. *See General Analytics Corp. v. CNA Ins. Cos.*, 86 F.3d 51, 54 (4th Cir.1996) ("Because employee dishonesty policies like CNA Insurance's require proof that the employee have acted to accomplish a particular purpose, they require that the insured establish a specific intent, analogous to that required by the criminal law."). And reckless conduct, taken as circumstantial evidence of intent, could suffice to defeat a motion for summary judgment by creating a factual question for the jury. The linkage between the reckless conduct and the loss to the insured, however, would have to be far tighter than in this case.

## V

We conclude by addressing two other arguments made by Peoples.

### A

■ Peoples prefaces its brief by calling our attention to a battery of interpretive canons that the Kentucky Supreme Court has applied to insurance contracts. The Kentucky Supreme Court has recited these rules as follows:

> [A]s to the manner of construction of insurance policies, Kentucky law is crystal clear that exclusions are to be narrowly interpreted and all questions resolved in favor of the insured. Exceptions and exclusions are to be strictly construed so as to render the insurance effective. Any doubt as to the coverage or terms of a policy should be resolved in favor of the insured. And since the policy is drafted in all details by the insurance company, it must be held strictly accountable for the language used.

*Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859 (Ky.1992) (citations omitted).

An examination of the cases cited in *Eyler* reveals that the canons are to be applied when the language of the insurance contract is ambiguous or self-contradictory. Otherwise, the contract is to be read according to its plain meaning, its true character and purpose, and the intent of the policies. The canons cited by Peoples are rules for determining the meaning of murky words and structure in the policy; they do not purport to resolve the ambiguities and self-contradictions of facts in the world. So long as the meaning of "manifest intent" is uncertain, we shall resort to the above-cited canons; but once that meaning is settled, the canons are of no use in determining whether an employee possessed such intent. That is a matter of examining the "external behavior ordinarily thought to manifest internal mental states," *St. Paul Fire & Marine*, 942 F.2d at 1035, which is what we have tried to do above.

### B

■ Peoples argues that because Aetna and OCIC each denied coverage for the Noble loss on a single, specific ground in 1985 and 1986, respectively, and did not raise any other defenses until this lawsuit was filed in 1994, the doctrines of waiver and estoppel bar the insurers from raising the "manifest intent" defense. The factual underpinning of this argument is that Peoples continually invited the insurers to defend or participate in defending the Noble suit; that they consistently declined, asserting and reasserting their lack of liability only on the grounds of time of discovery and the OCIC release; that the insurers at all times had knowledge of the relevant facts concerning the manifest intent defense; and that the insurers never reserved the manifest intent defense.

The district court concluded that "[h]aving concluded that the loss in question is not covered ... there is no need to address the issues concerning ... waiver[ ] and estoppel." Peoples argues that the court could not properly reach the merits of the manifest intent issue absent a determination that

waiver and estoppel did not apply; hence, summary judgment was inappropriate.[7]

Peoples cites an Eighth Circuit case in which the court, considering a claim under a fidelity bond, held that under Missouri law an insurer could not rely on a reason for non-coverage different from the reason it had originally given in its letter to the insured denying coverage. Consequently, it reversed the district court's judgment for the insurer on the basis of the second reason. *Delmar Bank of University City v. Fidelity & Deposit Co. of Md.*, 428 F.2d 32 (8th Cir.1970) ("Clearly this defense was not raised in the letter rejecting coverage.... We agree with the plaintiff's contention that this issue was not available to the defendant before the trial court. Under such circumstances, we cannot consider such issue upon the merits.").

Aetna and OCIC respond to Peoples's application of the waiver and estoppel theories by saying that Peoples is confusing *scope* of coverage—the basic range of risks covered—with *forfeiture* of coverage—that is, actions or omissions (usually by the insured) that relieve the other party (usually the insurer) of its obligations under the contract. The doctrines, Aetna and OCIC claim, pertain only to instances where the insurer denies coverage on the grounds that the insured has done one thing to forfeit coverage, and later changes its rationale to assert that the insured has done some other thing to forfeit coverage. With respect to scope of coverage, Aetna quotes the following rule:

> It has been repeatedly held that the doctrines of waiver and estoppel cannot be used to extend the coverage of an insurance policy or to create a primary liability ... while an insurer may be estopped, by its conduct or its knowledge or by statute, from insisting on a forfeiture of a policy, under no conditions can the coverage or restrictions on coverage be extended by waiver or estoppel.

16B APPLEMAN INSURANCE LAW AND PRACTICE (1981) 579 § 9090.

Peoples insists that such is not the law in Kentucky, citing *National Life & Accident Insurance Co. v. Ransdell*, 259 Ky. 559, 82 S.W.2d 820 (1935). In that case, Ransdell paid premiums on a disability policy over the course of a number of years after he reached the age of fifty, even though the policy stated that it did not cover persons above that age. The insurer accepted the premiums, and even indemnified Ransdell for several losses he incurred after reaching fifty. Ransdell sued to recover the premiums. The Court of Appeals reasoned that:

> There is only one question to be answered in this case, and that is, Was the company by reason of its acceptance and retention of the premiums voluntarily paid by insured after he became fifty years of age liable to insured upon the policy? If it was, then it should be allowed to retain the premiums, because they were earned....

> There can be little doubt but that the company was at all times liable to appellee for the indemnities provided by the policy.... [For example,] [i]n case an insurance company retains an overdue premium ... it will be held to have waived any right of forfeiture, and is estopped to claim that the policy was not in force.

> ...

> The foundation of the doctrine of waiver is that the company has by its conduct induced the insured to believe that the insurance would not be affected by a variation from the strict letter and rigid requirements of the policy.... The reason for the rule is obvious, as it would be unjust and unfair, for the insurer, after liability had attached, to assert and insist upon something it had led the insured to believe it would waive. An insurer having knowledge of grounds which would work a forfeiture or permit it to evade liability must, within a reasonable time, assert such grounds or be thereafter estopped. *Svea Fire & Life Ins. Co. v. Foxwell*, 234 Ky. 95, 27 S.W.2d 675 [1930].

---

**7.** OCIC rather remarkably argues that this court has no "standing" to address the waiver and estoppel arguments because the district court never did. Of course, this court reviews the law de novo, and if there were a binding reason that the district court should not have reached its decision on manifest intent, it would be grounds for reversal.

*Ransdell,* 82 S.W.2d at 821–22. Consequently, the court held that the insurer's acceptance of Ransdell's premiums meant that the coverage was in force, the premiums were earned, and Ransdell was not entitled to a refund. Clearly, at issue here was not an act of forfeiture by Ransdell, but a limitation (by age) on the scope of coverage. The court's holding thus runs counter to the rule quoted above in Appleman.

Peoples submits a Texas case that lists Kentucky as one of the minority of states not following Appleman. *Great Am. Reserve Ins. Co. v. Mitchell,* 335 S.W.2d 707 (Tex.Civ. App.1960). It also cites a Tennessee case, *Bill Brown Construction Co. v. Glens Falls Insurance Co.,* 818 S.W.2d 1 (Tenn.1991) and a Louisiana case, *Tate v. Charles Aguillard Insurance & Real Estate, Inc.,* 508 So.2d 1371 (La.1987), discussing the majority and minority views. In the latter two cases, the states' supreme courts adopted the minority view. Curiously, although both cases thoroughly discuss the split in the law, neither mentions Kentucky among the examples of those states subscribing to the minority view.

Although Ransdell is not as square or as recent a holding as one might like to have, we believe it implies that under Kentucky law the scope of coverage can be expanded by waiver and estoppel. Further, the recent Tennessee and Louisiana cases adopting that view suggest that this is the direction of the law. It is not necessary for us to make a holding on this issue, however, and we leave it for another day, and preferably to a Kentucky court. For present purposes, we shall only assume without deciding that waiver and estoppel can work to expand the scope of coverage. Unfortunately for Peoples, this assumption does not help it much.

In one formulation of Kentucky's law of waiver, it has been said that "express waiver must be supported by consideration, and that an implied waiver arises only where a party has engaged in conduct or performed acts inconsistent with the existence of the right alleged to have been waived, misleading the other party to his prejudice." *Greensburg Deposit Bank v. GGC–Goff Motors,* 851 S.W.2d 476, 478 (Ky.1993) (discussing waiver in context of mechanic's lien). Other Kentucky cases have recognized the rule found in other states that a finding of implied waiver requires a "clear, unequivocal, and decisive act showing an intention to relinquish the right." *See Herndon v. Wingo,* 404 S.W.2d 453, 454 (Ky.1966); *Jones v. Rayborn,* 346 S.W.2d 743, 747 (Ky.1961).

With respect to the *Wingo* rule, we believe that neither insurer committed such a "clear, unequivocal, and decisive act." The only acts were to send letters denying coverage that gave reasons other than the absence of manifest intent.

Under the *GGC–Goff* variant, the question is whether Peoples was misled to its prejudice. Peoples describes the prejudice it suffered from the insurers' failure to raise the defense promptly as follows:

> Harris' actions that ultimately gave rise to the Noble lawsuit occurred in 1979—sixteen years ago.... Had the bond companies put Peoples Bank on notice in 1985 that they would deny coverage based on manifest intent, the bank could have much more easily assembled the necessary proof to rebut that defense. As it was, the bond companies waited until 1994 to raise the issue, thus severely diminishing the availability of evidence concerning Harris' intent in 1979.

The argument that Peoples suffered in its ability to rebut the manifest intent defense, and that amounted to prejudice adequate to support waiver, is superficially plausible. But did Peoples really suffer in that way? What Peoples needed to do to rebut the manifest intent defense in this case it also needed to do to investigate, in 1982, the SBA allegations and to submit its proof of loss to OCIC with respect to the losses suffered in that connection. That is, it had to investigate the actions and intentions of the involved directors with respect to the sale of the Iron Gate. Peoples had reason to continue investigating in 1985 and thereafter for purposes of the Noble lawsuit irrespective of whether the insurers planned to contest the "manifest intent" of its directors.

Therefore, Peoples's argument that the insurers' failure until 1994 to offer the manifest intent defense harmed Peoples's ability to

rebut that defense is not convincing. Consequently, there was no prejudice sufficient to support implied waiver.

The result is the same with respect to Peoples's claim of estoppel. Kentucky courts have repeatedly recognized that "injury, detriment, or prejudice" is an element of equitable estoppel. *See, e.g., Natural Resources and Envtl. Protection Cabinet v. Kentucky Harlan Coal Co.,* 870 S.W.2d 421, 426 (Ky.Ct. App.1993). Just as, by the analysis above, Peoples failed to show prejudice sufficient to support an implied waiver, it has failed to show prejudice adequate to support estoppel. The insurers were not barred from raising the manifest intent defense.

### VI

For the reasons set forth above, the district court's order granting the motions for summary judgment by OCIC and Aetna is AFFIRMED.